# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ALINEA CLO, LTD., ANNISA CLO, LTD., BARDOT CLO, LTD., CARBONE CLO, LTD., INVESCO CLO 2021-1, LTD., INVESCO CLO 2021-2, LTD., INVESCO CLO 2021-3, LTD., INVESCO CLO 2022-1, LTD., INVESCO CLO 2022-2, LTD., INVESCO CLO 2022-3, LTD., INVESCO U.S. CLO 2023-1, LTD., INVESCO U.S. CLO 2023-2, LTD., INVESCO U.S. CLO 2024-1, LTD., DIVERSIFIED CREDIT PORTFOLIO LTD., INVESCO FLOATING RATE ESG FUND, MILOS CLO, LTD., HARBOURVIEW CLO VII-R LTD., INVESCO PEAK NINE, LP, RECETTE CLO, LTD., RISERVA CLO, LTD., INVESCO SAKURA US SENIOR SECURED FUND, INVESCO SENIOR FLOATING RATE FUND, INVESCO SENIOR INCOME TRUST, INVESCO SENIOR LOAN FUND, INVESCO SSL FUND LLC, INVESCO TETON FUND LLC, UPLAND CLO, LTD., VERDE CLO, LTD., INVESCO ZODIAC FUNDS – INVESCO EUROPEAN SENIOR LOAN FUND, INVESCO ZODIAC FUNDS – INVESCO US SENIOR LOAN FUND, ARTISAN HIGH INCOME FUND, ARTISAN FLOATING RATE FUND, ARTISAN CREDIT OPPORTUNITIES MASTER FUND LP, ELMWOOD CLO I LTD., ELMWOOD CLO II, LTD., ELMWOOD CLO III, LTD., ELMWOOD CLO IV, LTD., ELMWOOD CLO V LTD., ELMWOOD CLO VI LTD., ELMWOOD CLO VII LTD., ELMWOOD CLO VIII LTD., ELMWOOD CLO IX LTD., ELMWOOD CLO X, LTD., ELMWOOD CLO XI, LTD., ELMWOOD CLO XII, LTD., ELMWOOD CLO 14 LTD., ELMWOOD CLO 15 LTD., ELMWOOD CLO 16 LTD., ELMWOOD CLO 17 LTD., ELMWOOD CLO 18 LTD., ELMWOOD CLO 19 LTD., ELMWOOD CLO 20 LTD., ELMWOOD CLO 21 LTD., ELMWOOD CLO 29 LTD., ELMWOOD CLO 33 LTD., ELMWOOD CLO 36 LTD., PALMER SQUARE BDC FUNDING I LLC, PALMER SQUARE CLO 2014-1, LTD., PALMER SQUARE CLO 2015-1, LTD., PALMER SQUARE CLO 2015-2, LTD., | **COMPLAINT** |

PALMER SQUARE CLO 2018-1 LTD., PALMER SQUARE CLO 2018-2, LTD., PALMER SQUARE CLO 2018-3, LTD., PALMER SQUARE CLO 2019-1, LTD., PALMER SQUARE CLO 2020-3, LTD., PALMER SQUARE CLO 2021-1, LTD., PALMER SQUARE CLO 2021-2, LTD., PALMER SQUARE CLO 2021-4, LTD., PALMER SQUARE CREDIT FUNDING 2019-1, LTD., PALMER SQUARE FLOATING RATE FUND LLC, CERBERUS CORPORATE CREDIT FUND LP, CERBERUS N-1 FUNDING LLC, CERBERUS ASRS FUNDING LLC, CERBERUS SWC LEVERED HOLDINGS II LP, CERBERUS REDWOOD LEVERED LOAN OPPORTUNITIES FUND A, L.P., CERBERUS REDWOOD LEVERED B LLC, CERBERUS ND CREDIT HOLDINGS LLC, CERBERUS CAVALIERS LEVERED LOAN OPPORTUNITIES FUND, LLC, CERBERUS KRS LEVERED LLC, CERBERUS STEPSTONE CREDIT HOLDINGS LLC, RELIANCE STANDARD LIFE INSURANCE COMPANY, CERBERUS OFFSHORE UNLEVERED LOAN OPPORTUNITIES MASTER FUND IV, L.P., CERBERUS LEVERED IV HOLDINGS LLC, CERBERUS OFFSHORE LEVERED IV LLC, CERBERUS AOZ LOAN OPPORTUNITIES FUND, L.P., CERBERUS 2112 LEVERED LLC, CERBERUS RR LEVERED LLC, CINNABAR 2021 DIRECT LENDING LIMITED, CERBERUS LOAN FUNDING XXXVII, L.P., CERBERUS C-1 LEVERED II LLC, CERBERUS LOAN FUNDING XXXVIII L.P., CERBERUS REDWOOD LEVERED B II LLC, CERBERUS LOAN FUNDING XXXIX L.P., CERBERUS LOAN FUNDING XL, LLC, CERBERUS LOAN FUNDING XLI, LLC, VENTURE XV CLO, LIMITED, VENTURE XIX CLO, LIMITED, VENTURE XXII CLO, LIMITED, VENTURE XXIII CLO, LTD., VENTURE XXVI CLO, LTD., VENTURE XXVII CLO, LTD., VENTURE XXIX CLO, LTD., VENTURE XXVIII CLO, LTD., VENTURE 28A CLO, LTD., VENTURE XXX CLO, LTD., VENTURE 31 CLO, LTD., VENTURE 33 CLO, LTD., VENTURE 32 CLO, LTD., VENTURE 35 CLO, LTD., VENTURE 34

2

CLO, LTD., VENTURE 36 CLO, LTD., VENTURE 37 CLO, LTD., VENTURE 38 CLO, LTD., VENTURE 41 CLO, LTD., VENTURE 42 CLO, LTD., VENTURE 43 CLO, LTD., VENTURE 44 CLO, LTD., VENTURE 45 CLO, LTD., and VENTURE 46 CLO, LTD.,

*Plaintiffs*,

v.

ORCHID MERGER SUB II, LLC, S1 MEDIA, LLC, S1 HOLDCO, LLC, and SONIC NEWCO, LLC,

*Defendants*.

Plaintiffs Alinea CLO, Ltd., Annisa CLO, Ltd., Bardot CLO, Ltd., Carbone CLO, Ltd., Invesco CLO 2021-1, Ltd., Invesco CLO 2021-2, Ltd., Invesco CLO 2021-3, Ltd., Invesco CLO 2022-1, Ltd., Invesco CLO 2022-2, Ltd., Invesco CLO 2022-3, Ltd., Invesco U.S. CLO 2023-1, Ltd., Invesco U.S. CLO 2023-2, Ltd., Invesco U.S. CLO 2024-1, Ltd., Diversified Credit Portfolio Ltd., Invesco Floating Rate ESG Fund, Milos CLO, Ltd., Harbourview Clo VII-R Ltd., Invesco Peak Nine, LP, Recette CLO, Ltd., Riserva CLO, Ltd., Invesco Sakura US Senior Secured Fund, Invesco Senior Floating Rate Fund, Invesco Senior Income Trust, Invesco Senior Loan Fund, Invesco SSL Fund LLC, Invesco Teton Fund LLC, Upland CLO, Ltd., Verde CLO, Ltd., Invesco Zodiac Funds – Invesco European Senior Loan Fund, and Invesco Zodiac Funds – Invesco US Senior Loan Fund (collectively, the "Invesco Lenders"); Artisan High Income Fund, Artisan Floating Rate Fund, and Artisan Credit Opportunities Master Fund LP (collectively, the "Artisan Lenders"); Elmwood CLO I Ltd., Elmwood CLO II, Ltd., Elmwood CLO III, Ltd., Elmwood CLO IV, Ltd., Elmwood CLO V Ltd., Elmwood CLO VI Ltd., Elmwood CLO VII Ltd., Elmwood CLO VIII Ltd., Elmwood CLO IX Ltd., Elmwood CLO X, Ltd., Elmwood CLO XI, Ltd., Elmwood CLO XII, Ltd., Elmwood CLO 14 Ltd., Elmwood CLO 15 Ltd., Elmwood CLO 16 Ltd., Elmwood

3

CLO 17 Ltd., Elmwood CLO 18 Ltd., Elmwood CLO 19 Ltd., Elmwood CLO 20 Ltd., Elmwood

CLO 21 Ltd., Elmwood CLO 29 Ltd., Elmwood CLO 33 Ltd., and Elmwood CLO 36 Ltd.

(collectively, the "Elmwood Lenders"); Palmer Square BDC Funding I LLC, Palmer Square CLO

2014-1, Ltd., Palmer Square CLO 2015-1, Ltd., Palmer Square CLO 2015-2, Ltd., Palmer Square

CLO 2018-1 Ltd., Palmer Square CLO 2018-2, Ltd., Palmer Square CLO 2018-3, Ltd., Palmer

Square CLO 2019-1, Ltd., Palmer Square CLO 2020-3, Ltd., Palmer Square CLO 2021-1, Ltd.,

Palmer Square CLO 2021-2, Ltd., Palmer Square CLO 2021-4, Ltd., Palmer Square Credit

Funding 2019-1, Ltd., and Palmer Square Floating Rate Fund LLC (collectively, the "Palmer

Square Lenders"); Cerberus Corporate Credit Fund LP, Cerberus N-1 Funding LLC, Cerberus

ASRS Funding LLC, Cerberus SWC Levered Holdings II LP, Cerberus Redwood Levered Loan

Opportunities Fund A, L.P., Cerberus Redwood Levered B LLC, Cerberus ND Credit Holdings

LLC, Cerberus Cavaliers Levered Loan Opportunities Fund, LLC, Cerberus KRS Levered LLC,

Cerberus StepStone Credit Holdings LLC, Reliance Standard Life Insurance Company, Cerberus

Offshore Unlevered Loan Opportunities Master Fund IV, L.P., Cerberus Levered IV Holdings

LLC, Cerberus Offshore Levered IV LLC, Cerberus AOZ Loan Opportunities Fund, L.P.,

Cerberus 2112 Levered LLC, Cerberus RR Levered LLC, Cinnabar 2021 Direct Lending Limited,

Cerberus Loan Funding XXXVII, L.P., Cerberus C-1 Levered II LLC, Cerberus Loan Funding

XXXVIII L.P., Cerberus Redwood Levered B II LLC, Cerberus Loan Funding XXXIX L.P.,

Cerberus Loan Funding XL, LLC, and Cerberus Loan Funding XLI, LLC (collectively, the

"Cerberus Lenders"), Venture XV CLO, Ltd., Venture XIX CLO, Ltd., Venture XXII CLO, Ltd.,

Venture XXIII CLO, Ltd., Venture XXVI CLO, Ltd., Venture XXVII CLO, Ltd., Venture XXIX

CLO, Ltd., Venture XXVIII CLO, Ltd., Venture 28A CLO, Ltd., Venture XXX CLO, Ltd.,

Venture 31 CLO, Ltd., Venture 33 CLO, Ltd., Venture 32 CLO, Ltd., Venture 35 CLO, Ltd.,

4

Venture 34 CLO, Ltd., Venture 36 CLO, Ltd., Venture 37 CLO, Ltd., Venture 38 CLO, Ltd.,

Venture 41 CLO, Ltd., Venture 42 CLO, Ltd., Venture 43 CLO, Ltd., Venture 44 CLO, Ltd.,

Venture 45 CLO, Ltd., and Venture 46 CLO, Ltd. (collectively, the "MJX Lenders" and together

with the Invesco Lenders, the Artisan Lenders, the Elmwood Lenders, the Palmer Square Lenders,

the Cerberus Lenders, "Plaintiffs" or the "Lenders"), for their complaint against defendants Orchid

Merger Sub II, LLC (the "Borrower"), S1 Media, LLC   ("S1 Media"), S1 Holdco, LLC

("Holdings"), and Sonic Newco LLC ("Sonic" and together with the Borrower, S1 Media, and

Holdings, "Defendants" and Defendants, together with their various subsidiaries, "System1"),

allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## NATURE OF THE ACTION

1.      In January 2022, Plaintiffs, together with certain non-party lenders, extended a

$400 million loan (the "Term Loan") to the Borrower (an indirect subsidiary of System1) secured

by a first-priority lien on substantially all of the Borrower's and the Guarantors' assets (the

"Collateral").[1]  Less than two years after entering into the Term Loan, the Borrower's financial

condition began to deteriorate.  In November 2023 and August 2024, the Borrower unlawfully

transferred valuable assets from Plaintiffs' Collateral to entities outside Plaintiffs' Collateral for

the benefit of System1's insiders and shareholders.[2] ███████████████████████

███████████████████████.  The transfers of these assets are voidable as both

intentional   and   constructive   fraudulent   transfers   under   California's   Uniform   Voidable

---

[1]     The Term Loan was issued pursuant to that certain Credit and Guarantee Agreement, dated as of January 27, 2022 by and among Orchid Merger Sub II, LLC, as the Borrower, S1 Holdco, LLC, as Holdings, the Subsidiaries of the Borrower from time to time party thereto, the lenders from time to time party thereto Bank of America, N.A. as Administrative Agent, Swing Line Lender and L/C Issuer, and Bank of America, N.A. as Lead Arranger and Bookrunner (as amended, restated, and/or modified from time to time, the "Credit Agreement").

Capitalized terms not defined herein shall have the meanings ascribed to them in the Credit Agreement.

[2]     Plaintiffs collectively hold more than 50% of the outstanding amount of the loans issued under the Credit Agreement and accordingly constitute the "Required Lenders," as that term is defined in the Credit Agreement.

Case 1:25-cv-09032-VM    Document 1-1    Filed 10/30/25    Page 7 of 39

Transactions Act because the Borrowers made these transfers (i) in return for less than reasonably equivalent value while the Borrower was insolvent, and (ii) with the actual intent to hinder, delay, and defraud the Lenders.  Defendants designed these elaborate, multi-step transactions to move assets to entities not included in Plaintiffs' Collateral while circumventing the Credit Agreement's provisions that prohibited the transfers or at least required the Borrower to use the proceeds of the sale of the Collateral to prepay the Term Loan.

2.       This action seeks to avoid these transactions as intentional and constructive fraudulent transfers as well as to recover damages for breach of the Credit Agreement.[3]

\* \* \* \* \*

3.       System1 is a publicly traded company founded by its Chief Executive Officer and Chairman of the Board of Directors (the "Board"), Michael Blend, and Chief Operating Officer, Charles Ursini, who also sits on the Board.  Blend and Ursini are among System1's largest shareholders.  In 2023, they were also significant unsecured creditors, having extended unsecured loans to System1 in the amounts of (i) $20 million in April 2023 when System 1 was in the midst of a liquidity crisis; and (ii) $2.5 million in October 2023 immediately prior to the Borrower's first transfer of assets away from the Lenders' Collateral.

4.       System1's financial performance started to deteriorate in late 2022.  To salvage their underwater personal equity stakes and significant unsecured debt holdings, Blend and Ursini caused System1 to execute two transactions that transferred the Borrower's most valuable assets away from the Lenders' Collateral to unrestricted subsidiaries not subject to the Lenders' liens for the benefit of Blend, Ursini, and System1's other shareholders.

---

[3]     Plaintiffs intend to file fraudulent conveyance claims against System1's insiders in a separate action in California.

5. In November 2023, Blend and Ursini caused the Borrower to transfer assets worth more than $400 million to an insider investor group (the "Insider Purchasers" and such transaction the "November 2023 Transaction").[4] The Insider Purchasers were led by affiliates of Avance Investment Management, LLC, ("Avance") and Just Develop It Limited ("JDI").[5] Prior to the November 2023 Transaction, those assets were owned by the Borrower and were part of Plaintiffs' Collateral. Pursuant to Section 2.06 of the Credit Agreement, if the Borrower sold any of those assets directly, it would have had to apply the proceeds of the sale to prepay the Term Loan. To circumvent this requirement, the Borrower first transferred the assets to a newly-designated Unrestricted Subsidiary. Under the Credit Agreement, assets held by Unrestricted Subsidiaries are not part of Plaintiffs' Collateral. Consequently, the proceeds from the sale of those assets were not required to be used to prepay the Term Loan. The Unrestricted Subsidiary then sold the assets it had received from the Borrower to the Insider Purchasers. The Insider Purchasers then transferred the cash purchase price to the Unrestricted Subsidiary, where it remained outside Plaintiffs' Collateral. And a portion of the purchase price was used to repay Blend and Urisini's unsecured debt *at par, plus "closing" fees*.

6. The transfer of assets from Plaintiffs' Collateral to an Unrestricted Subsidiary in the November 2023 Transaction significantly impaired the value of Plaintiffs' Term Loan. At the time of the November 2023 Transaction, the Borrower was insolvent and was left undercapitalized thereafter. Indeed, the markets recognized that the Borrower was insolvent at that time, as prior to the November 2023 Transaction, the Term Loan was trading at 65 cents on the dollar. By

---

[4] The Officer's Certificate, dated December 8, 2023, executed by the Borrower in connection with the November 2023 Transaction indicates that the market value of the assets sold was approximately $400 million.

[5] At the time of the November 2023 Transaction, JDI was one of System1's largest shareholders, and Christopher Philipps, the controlling shareholder and a director of JDI, also served on the Board. John Civantos, a senior partner at Avance, is a current member of the Board.

7

December 2023, the debt traded down to 55 cents on the dollar, and has since traded down further to 50 cents on the dollar in 2025.

7.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.

8.     System1's malfeasance did not end there.  In August 2024, the Borrower transferred its Products Business (as defined below) to a newly-created, indirect parent company of the Borrower that was not subject to the security interests of the Plaintiffs and the other lenders (the "August 2024 Transaction").  The value of the Products Business, by Blend's own admission to the investing public, was more than the entire enterprise value of System1.  The August 2024 Transaction had no business purpose other than to transfer additional assets out of Plaintiffs' Collateral and into a holding company outside of Plaintiffs' reach solely for the benefit of System1's shareholders.  Indeed, in an August 2025 earnings call, Blend touted the value of the transaction to System1's shareholders.  He told analysts that the investing public had overlooked the value of these assets that were no longer included in the Collateral but were now available to System1 shareholders.  This second transfer of assets outside of the Lenders' Collateral for the benefit of System1's shareholders also should be avoided as an intentional and constructive fraudulent transfer.

9.     The August 2024 Transaction also breached multiple provisions of the Credit Agreement designed to restrict the Borrower's ability to transfer assets out of the Lenders'

Collateral.  Specifically, the August 2024 Transaction violated, among other sections, (i) Section 7.10 of the Credit Agreement, which bars the Borrower from transferring substantially all of its assets without the transferee assuming the Term Loan obligations (which did not occur here), (ii) Section 7.02 of the Credit Agreement, which limits the Borrower's ability to transfer assets to Unrestricted Subsidiaries, and (iii) Section 7.06 of the Credit Agreement, which limits the Borrower's ability to make dividends.

10.      This action seeks to redress the demonstrable and significant harm suffered by Plaintiffs by seeking (i) avoidance of these transactions as intentional and constructive fraudulent transfers pursuant to the California Uniform Voidable Transfer Act, and (ii) money damages sufficient to compensate the Lenders for the harms caused by Defendants' breaches of the Credit Agreement.

## PARTIES

11.      Plaintiffs Alinea CLO, Ltd., Annisa CLO, Ltd., Bardot CLO, Ltd., Carbone CLO, Ltd., Invesco CLO 2021-1, Ltd., Invesco CLO 2021-2, Ltd., Invesco CLO 2021-3, Ltd., Invesco CLO 2022-1, Ltd., Invesco CLO 2022-2, Ltd., Invesco CLO 2022-3, Ltd., Invesco U.S. CLO 2023-1, Ltd., Invesco U.S. CLO 2023-2, Ltd., Invesco U.S. CLO 2024-1, Ltd., Diversified Credit Portfolio Ltd., Invesco Floating Rate ESG Fund, Milos CLO, Ltd., Harbourview Clo VII-R Ltd., Invesco Peak Nine, LP, Recette CLO, Ltd., Riserva CLO, Ltd., Invesco Sakura US Senior Secured Fund, Invesco Senior Floating Rate Fund, Invesco Senior Income Trust, Invesco Senior Loan Fund, Invesco SSL Fund LLC, Invesco Teton Fund LLC, Upland CLO, Ltd. Verde CLO, Ltd. Invesco Zodiac Funds – Invesco European Senior Loan Fund, and Invesco Zodiac Funds – Invesco US Senior Loan Fund (collectively defined above as the Invesco Lenders) are investment funds incorporated in Delaware, the Cayman Islands, Jersey, Channel Islands, or Luxembourg.  The

9

Invesco Lenders are managed by Invesco Senior Secured Management, Inc., an investment management company headquartered in New York, New York.

12.     Plaintiffs Artisan High Income Fund, Artisan Floating Rate Fund, and Artisan Credit Opportunities Master Fund LP (collectively defined above as the Artisan Lenders) are investment funds incorporated in Wisconsin or the Cayman Islands.  The Artisan Lenders are managed by Artisan Partners Limited Partnership, an investment management company headquartered in Milwaukee, Wisconsin.

13.     Plaintiffs Elmwood CLO I Ltd., Elmwood CLO II, Ltd., Elmwood CLO III, Ltd., Elmwood CLO IV, Ltd., Elmwood CLO V Ltd., Elmwood CLO VI Ltd., Elmwood CLO VII Ltd., Elmwood CLO VIII Ltd., Elmwood CLO IX Ltd., Elmwood CLO X, Ltd., Elmwood CLO XI, Ltd., Elmwood CLO XII, Ltd., Elmwood CLO 14 Ltd., Elmwood CLO 15 Ltd., Elmwood CLO 16 Ltd., Elmwood CLO 17 Ltd., Elmwood CLO 18 Ltd., Elmwood CLO 19 Ltd., Elmwood CLO 20 Ltd., Elmwood CLO 21 Ltd., Elmwood CLO 29 Ltd., Elmwood CLO 33 Ltd., and Elmwood CLO 36 Ltd. (collectively defined above as the Elmwood Lenders) are investment funds incorporated in the Cayman Islands.  The Elmwood Lenders are managed by Elmwood Asset Management, an investment management company headquartered in New York, New York.

14.     Plaintiffs Palmer Square BDC Funding I LLC, Palmer Square CLO 2014-1, Ltd., Palmer Square CLO 2015-1, Ltd., Palmer Square CLO 2015-2, Ltd., Palmer Square CLO 2018-1 Ltd., Palmer Square CLO 2018-2, Ltd., Palmer Square CLO 2018-3, Ltd., Palmer Square CLO 2019-1, Ltd., Palmer Square CLO 2020-3, Ltd., Palmer Square CLO 2021-1, Ltd., Palmer Square CLO 2021-2, Ltd., Palmer Square CLO 2021-4, Ltd., Palmer Square Credit Funding 2019-1, Ltd., and Palmer Square Floating Rate Fund LLC (collectively defined above as the Palmer Square

Lenders) are investment funds managed by Palmer Square Capital Management LLC, an investment management company headquartered in Mission Woods, Kansas.

15.    Plaintiffs Cerberus Corporate Credit Fund LP, Cerberus N-1 Funding LLC, Cerberus ASRS Funding LLC, Cerberus SWC Levered Holdings II LP, Cerberus Redwood Levered Loan Opportunities Fund A, L.P., Cerberus Redwood Levered B LLC, Cerberus ND Credit Holdings LLC, Cerberus Cavaliers Levered Loan Opportunities Fund, LLC, Cerberus KRS Levered LLC, Cerberus StepStone Credit Holdings LLC, Reliance Standard Life Insurance Company, Cerberus Offshore Unlevered Loan Opportunities Master Fund IV, L.P., Cerberus Levered IV Holdings LLC, Cerberus Offshore Levered IV LLC, Cerberus AOZ Loan Opportunities Fund, L.P., Cerberus 2112 Levered LLC, Cerberus RR Levered LLC, Cinnabar 2021 Direct Lending Limited, Cerberus Loan Funding XXXVII, L.P., Cerberus C-1 Levered II LLC, Cerberus Loan Funding XXXVIII L.P., Cerberus Redwood Levered B II LLC, Cerberus Loan Funding XXXIX L.P., Cerberus Loan Funding XL, LLC, and Cerberus Loan Funding XLI, LLC (collectively defined above as the Cerberus Lenders) are investment funds managed by Cerberus Capital Management, L.P., an investment management company headquartered in New York, New York.

16.    Plaintiffs Venture XV CLO, Ltd., Venture XIX CLO, Ltd., Venture XXII CLO, Ltd., Venture XXIII CLO, Ltd., Venture XXVI CLO, Ltd., Venture XXVII CLO, Ltd., Venture XXIX CLO, Ltd., Venture XXVIII CLO, Ltd., Venture 28A CLO, Ltd., Venture XXX CLO, Ltd., Venture 31 CLO, Ltd., Venture 33 CLO, Ltd., Venture 32 CLO, Ltd., Venture 35 CLO, Ltd., Venture 34 CLO, Ltd., Venture 36 CLO, Ltd., Venture 37 CLO, Ltd., Venture 38 CLO, Ltd., Venture 41 CLO, Ltd., Venture 42 CLO, Ltd., Venture 43 CLO, Ltd., Venture 44 CLO, Ltd., Venture 45 CLO, Ltd., and Venture 46 CLO, Ltd. (collectively defined above as the MJX Lenders)

11

are investment funds managed by MJX Asset Management LLC, an investment management company headquartered in New York, New York.

17.     Defendant Orchid Merger Sub II, LLC (defined above as the Borrower) is a Delaware limited liability company.  The Borrower is a wholly-owned subsidiary of Defendant Holdings.

18.     Defendant S1 Media, LLC (defined above as S1 Media) is a Delaware limited liability company.  S1 Media is a wholly-owned subsidiary of non-party System1, Inc.

19.     Defendant S1 Holdco, LLC (defined above as Holdings) is a Delaware limited liability company.  Holdings is a wholly-owned subsidiary of non-party System1, Inc.

20.     Defendant Sonic Newco, LLC (defined above as Sonic), is a Delaware limited liability company and wholly-owned subsidiary of the Borrower.

21.     Non-party System1, Inc., the ultimate parent company of Borrower and affiliated entities, is a Delaware corporation that, upon information and belief, maintains its principal place of business in Los Angeles, California.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action and Defendants under CPLR 301 because Defendants transact business in New York state and Defendants have consented to this Court's jurisdiction under the Credit Agreement governing this dispute.

23.     This Court also has jurisdiction over this action and Defendants under Section 5-1402 of the New York General Obligations Law because this action arises out of one or more contracts that (i) contain a clause in which the parties have submitted to jurisdiction in New York (Credit Agreement § 11.16(b)); (ii) contain a clause choosing New York as the governing law (*id.*

§ 11.16(a)); and (iii) relate to an obligation arising from a transaction involving more than $1 million in the aggregate.

24.    Venue is proper in this Court under CPLR 501 and 503 respectively because the contracts governing this dispute provide for venue in New York County and a substantial part of the events or omissions giving rise to the claims occurred in New York County.  *See* Credit Agreement § 11.16(b).

## FACTS

### I.    System1's Historical Business.

25.    System1 was founded in 2013 by co-founders Blend and Ursini.  It went public via SPAC merger in January 2022.

26.    Historically, System1 operated two primary business segments.  *First*, System1 provides advertising services through a proprietary platform known as the Responsive Acquisition Marketing Platform ("RAMP").  RAMP delivers valuable "high-intent" customers (*i.e.*, customers who know what they want to buy and are likely to do so) to advertisers, as well as to System1 itself.  Specifically, RAMP utilizes machine learning to identify such high-intent customers and (i) advertise third-party products to them, and/or (ii) direct them to the 40+ websites System1 owns and operates, including MapQuest, Coupon Follow, HowStuffWorks, Info.com, and Startpage.com (such websites, the "Owned and Operated Business").  As part of its Owned and Operated Business, System1 also pays to acquire user traffic from other marketing channels (*e.g.*, Google) to its websites, where System1 then uses its RAMP marketing platform to qualify and identify high-intent users and sell the high-intent user traffic to advertisers.

27.    Over the past several years, the majority of System1's RAMP-driven revenue has been attributable to System1's commercial relationship with Google.

13

28.     *Second*, prior to November 2023, System1 provided antivirus software solutions to customers via a yearly subscription through Total Security Limited f/k/a Protected.net Group Limited (together with its wholly-owned subsidiaries, "Total Security").

## II.     The November 2023 Transaction.

29.     System1's financial performance began to materially deteriorate in late 2022 as its advertising services business line faced significant market headwinds.  By the third quarter of 2023, System1 was in significant distress.   Adjusted EBITDA from continuing operations (excluding Total Security) declined from $69.2 million in 2022 to $29.2 million in 2023, while net leverage ballooned from 3.0x in 2022 to 9.2x over the same timeframe.  System1's share price fell nearly 80% from December 31, 2021 to December 31 2023, and by nearly 92% from the peak in April 2022 to December 31, 2023.  The share price has subsequently fallen further and is now trading almost 96% below its April 2022 peak.

30.     On March 16, 2023, System1 announced in an 8-K filing that it would be delayed in filing its 2022 10-K so that it could complete an "evaluation and quantification of identified accounting errors in historical 2022 quarterly reporting periods."

31.     On June 5, 2023, System1 announced in its delayed 2022 10-K filing that it had material weaknesses in its internal controls.  According to the Public Company Accounting Board, such a material weakness is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."  In this 10-K, System1 disclosed that:

(i)     "We did not design and maintain effective controls to timely analyze and record the financial statement effects from acquisitions. Specifically, we did not design and maintain effective controls over the (i) application of U.S. GAAP to such transactions. . . ."

(ii)    "We did not design and maintain effective controls relating to the oversight and ongoing recording of the financial statement results of the acquired businesses."

(iii)    "We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over (i) the preparation and review of business performance reviews, account reconciliations and journal entries, and (ii) maintaining appropriate segregation of duties."

(iv)    "We did not design and maintain controls over the classification and presentation of accounts and disclosures in the consolidated financial statements, including the statement of cash flows."

(v)    "We did not design and maintain effective controls over the completeness and accuracy of accrued liabilities, stock based compensation and equity transactions."

(vi)    "We did not design and maintain effective controls over the accuracy and valuation of goodwill, including the allocation of goodwill to reporting units and the identification and measurement of goodwill impairment."

(vii)    "We did not design and maintain effective controls over information technology ("IT") general controls for information systems that are relevant to the preparation of our financial statements."

32.    As a result of these material weaknesses, System1 announced in June 2023 that it would have to restate its 2022 financial statements.  In the aftermath of these troubling disclosures, by June 2023 (five months before the November 2023 Transaction) the Term Loan was trading well below par at around 74 cents on the dollar, which indicated that the Borrower was insolvent.

33.    At the time of these disclosures, Blend and Ursini held large portions of System1's stock.  Blend currently owns 35,000 shares of System1 Class A common stock, in addition to another 11,558,471 shares held by Blend's father, in his capacity as trustee of various Trusts affiliated with the Blend family and in his individual capacity.  Ursini currently owns approximately 702,560 shares of System1 Class A common stock, in addition to another 13,592,663 shares that are held by CEE Holdings Trust.  Blend and Ursini also extended a $20 million unsecured loan to System1 in April 2023 when System1 was in the midst of a liquidity crisis, and an additional $2.5 unsecured loan immediately prior to the November 2023 Transaction.

34.     Because they were among System1's largest shareholders and also unsecured lenders, Blend and Ursini were strongly incentivized to create value for themselves and other shareholders, even if it came at the expense of the Lenders.  Indeed, management consistently emphasized their alignment with shareholders in public comments.  As Blend noted on an earnings call held on November 10, 2022, "[m]anagement shares your pain, *as we own over 50% of System1 and much of our net worth is in System1's stock*.  We remain highly aligned with our public shareholders." (emphasis added).

35.     In the November 2023 Transaction, the Borrower transferred its Total Security assets worth $400 million, which, prior to the transaction, were part of the Lenders' Collateral.[6]  The assets were sold to the Insider Purchasers and the proceeds were placed beyond the Lenders' reach.  The transaction was executed in a series of steps:

(i)     *First*, the Borrower formed Sonic, a Delaware limited liability company, as a wholly-owned subsidiary and designated Sonic as an Unrestricted Subsidiary.[7]  Assets held by Unrestricted Subsidiaries are not part of the Lenders' Collateral.

(ii)    *Second*, the Borrower contributed 49.99% of the equity interests in Total Security to Sonic.  Contemporaneously, the Borrower distributed a portion of the equity interests in Total Security up to Holdings.  This left the Borrower with approximately 38.39% of the equity of Total Security prior to the Total Security sale.

(iii)   *Third*, pursuant to a Share Purchase Agreement, dated November 30, 2023, the Unrestricted Subsidiary and the Borrower transferred the Total Security assets to the Insider Purchasers for approximately (i) $240 million in cash; (ii) the return and cancellation of approximately 29 million shares of System1's Class A common

---

[6]     As set forth above (*supra* ¶ 5 n.4), the Officer's Certificate dated December 8, 2023 executed by the Borrower in connection with the November 2023 Transaction indicates that the market value of the Total Security assets was approximately $400 million.

[7]     Under the Credit Agreement, "Unrestricted Subsidiary" means "(a) each Subsidiary of the Borrower listed on Schedule 1.01A and (b) any Subsidiary of the Borrower designated by a Responsible Officer of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.15 subsequent to the Closing Date (and continuing until such time that such designation may be thereafter revoked by the Borrower)) and (c) any Subsidiary of any Person described in the foregoing clauses (a) and/or (b)."  It is worth noting that, when the Borrower entered into the Credit Agreement, there were no subsidiaries designated as Unrestricted Subsidiaries pursuant to Schedule 1.01A of the Credit Agreement.

stock held by JDI and other entities and individuals affiliated with the Insider Purchasers; and (iii) certain other non-cash consideration.

(iv)  *Fourth*, the $240 million in cash consideration was allocated pro rata between the Borrower and the Unrestricted Subsidiary based on their respective equity interests in Total Security.

36.  These steps are depicted in the following graphic with the numbers corresponding

to the steps of the transaction described above:

### November 2023 Transaction – Disposition of Total Security



**Steps**

1  Orchid II creates Sonic Newco and designates Sonic Newco as an Unrestricted Subsidiary

2  Orchid II contributes a portion of the equity interests in Total Security to Sonic Newco and to S1 Holdco, LLC

3  Orchid II, Sonic Newco and S1 Holdco, LLC distribute Total Security equity interests to purchaser

4  Purchase price distributed by the purchaser to Orchid II and Sonic Newco



37.  The Borrower used a portion of the proceeds of the Total Security sale to make the

following payments:

(i)  $20 million in satisfaction of an unsecured revolving note provided by Lone Star Friends Trust and CEE Holdings Trust, which were established for the benefit of Michael Blend and Charles Ursini, respectively, including a 12% "closing fee" on the principal amount;

(ii)  $2.5 million in satisfaction of an unsecured term note provided by Defendant Openmail2, LLC, a Delaware limited liability company which is principally owned and managed by trusts established for the benefit of Blend and Ursini, including a 10% "closing fee" on the principal amount; and

(iii)     $10 million in satisfaction of a term loan provided by a subsidiary of JDI that was issued on October 6, 2023, including a 12% "closing fee" on the principal amount.[8]

38.     The Company also utilized a portion of the proceeds of the Total Security sale to repurchase $64.9 million in principal amount of the Term Loan for an aggregate purchase price of $41.6 million, 64.12% of its par value (such repurchase, the "Term Loan Repurchase").

39.     The November 2023 Transaction removed critical and valuable assets from the Collateral securing Plaintiffs' Term Loan.  As a result, the market value of the Term Loan fell from 65 to 55 cents on the dollar by mid-December 2023, before falling further to 50 cents on the dollar by 2025.  Notably, while the market value of the secured debt fell between November and December 2023, System1's stock price jumped from approximately $13 per share immediately prior to the November 2023 Transaction to $28 per share in December 2023, before falling again in early 2024.

40.     The Borrower was insolvent at the time of the November 2023 Transaction or was rendered insolvent thereby.  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████[9]

---

[8]     On October 6, 2023, Total Security entered into a Secured Facility Agreement (the "Facility Agreement") providing for a $10.0 million term loan with Onyx Asset Finance Limited, a company organized under the laws of England & Wales and a subsidiary of JDI.  Total Security entered into the Facility Agreement less than a month after publicly confirming receipt of the indication of interest from JDI in an 8-K filing.

[9]     ████████████████████████████████████████████████████████████

41.     The market's reaction to the November 2023 Transaction also strongly suggests that the transaction rendered the Borrower insolvent and inadequately capitalized.  On January 19, 2024, S&P Global Ratings ("S&P") issued a report downgrading the Term Loan's rating from "CCC" to "D" on the basis of the Term Loan Repurchase, which S&P described as "distressed and tantamount to a default."  The S&P Report explained that S&P's analysts:

> view[ed] the transaction as distressed because lenders received substantially less than originally promised, and we also viewed the company's capital structure as unsustainable and subject to default risk prior to the sale of its Total Security business and the subsequent debt repayment.  This was due to the company's elevated leverage and our expectations for negative free operating cash flow over the next 12 months with limited visibility into a recovery in performance given the ongoing advertising recession.

42.     ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████     The Borrower's insolvency was further evidenced by the fact that its *secured* debt was trading at a significant discount to par both before and after the transaction, indicating that the markets recognized that the fair market value of the Borrower's assets was less than the total amount of its liabilities.

## III.     The August 2024 Transaction Strips Additional Assets From the Lenders' Collateral for the Benefit of Shareholders.

43.     System1's insiders determined to remove additional assets from the Lenders' Collateral in August 2024.  This transaction was likewise conceived to enhance the value of their equity interests at the expense of the Lenders.  The August 2024 Transaction removed additional

---

████████████████████████████████████████████████

assets—a segment of the Company's Owned and Operated Business (the "Products Business")—from the Collateral package securing the Term Loan. Blend boasted to investors in August 2025 that the very assets that were stripped from Lenders in connection with this "corporate reorganization" were worth more than the publicly traded enterprise value of all of System1.

44. The August 2024 Transaction unfolded in four steps:

(i) *First*, the Borrower designated each of Privacy One Group Limited ("Privacy"), NextGen Shopping LLC ("NextGen"), Mapquest Holdings, LLC ("MQH"), and Mapquest Services Holdings ("MQSH"), which collectively owned the Products Business, as Unrestricted Subsidiaries.

(ii) *Second*, Privacy, NextGen, MQH, and MQSH transferred the Products Business down to their newly created subsidiaries, New Privacy One Group Inc. ("New Privacy"), New NextGen, LLC ("New NextGen"), New MQH, LLC ("New MQH"), and New MQSH, LLC ("New MQSH").

(iii) *Third*, New Privacy, New NextGen, New MQH, and New MQSH transferred the Products Business up to the Borrower through System1 OpCo, LLC ("OpCo") and System1 S1, Inc. ("S1").

(iv) *Fourth*, the Borrower transferred the Products Business through Holdings to a newly created parent entity of Holdings, System1 Holdings, LLC ("New Holdco").

(v) New Holdco transferred the Products Business down to a newly created entity, S1 Media, which is not a Loan Party (as such term is defined in the Credit Agreement).

45. These steps are depicted in the following graphic with the numbers corresponding to the steps described above:



**August 2024 Transaction – Corporate Reorganization**

46. In summary, the August 2024 Transactions transferred assets, which Blend conceded were worth more than the entire enterprise value of System1, from the Lenders' Collateral and channeled them into a newly created entity, S1 Media, which was not a Loan Party. This transaction effectively placed these assets beyond the reach of the Lenders. Because these assets are owned by an intermediate holding company that owns the Borrower, they are now owned solely for the benefit of System1's shareholders.

47. There was no plausible business purpose for the August 2024 Transaction other than to transfer assets out of Plaintiffs' Collateral to enrich System1's insiders and shareholders. Indeed, in its most recent 10-K filing with the SEC, System1 described the August 2024 Transaction simply as a "corporate reorganization," without any explanation of the underlying purposes or benefits of such reorganization. The same 10-K filing also notes that:

[f]ollowing the corporate reorganization, (a) System1 Holdings now owns 100% of [Holdings], the previous intermediate holding company with the non-controlling interests, and 100% of S1 Media, LLC ("S1 Media"), another new subsidiary formed in connection with the corporate reorganization, (b) S1 Media holds the assets and business operations associated with our owned and operated products businesses, which include NextGen Shopping, Inc. [], Startpage and Mapquest, and (c) [Holdings] holds our remaining assets and business operations associated with our digital advertising businesses, including our proprietary RAMP platform. [Holdings] and its subsidiaries remain obligors and guarantors under our Term Loan and 2022 Revolving Facility, **and System1 Holdings and S1 Media are not parties thereto**.

(emphasis added).

48.     In public statements since the August 2024 Transaction, System1's management has continued to highlight that the transaction stripped assets from the Lenders' Collateral. In an earnings call held on August 7, 2025, Blend emphasized to investors first, that "[o]n a standalone basis—and this is important—we believe our combined product businesses are worth significantly more than the current enterprise value of the entire company," and immediately thereafter noted that "**as a result of a corporate reorganization we did last summer, our products business segment is not collateral securing our credit agreement**." (emphasis added). Blend also opined that "we think that the market does not appreciate the true value of our product segment, particularly when you understand our overall corporate and capital structure."

49.     Indeed, it is unsurprising that the intent of the August 2024 Transaction was to transfer the Products Business away from the Lenders for the benefit of System1's shareholders, given that this business has been a stable driver of revenue, while the partner network business—which comprises the Lenders' remaining Collateral owned by the Borrower—has been significantly volatile as a result of that segment's dependence upon various external factors, including Google's business practices. As Blend noted in a March 10, 2025 earnings call, System1's positive results in the fourth quarter of 2024 "were primarily driven by our Owned & Operated products." Blend further noted that, "[i]n contrast, our marketing-driven businesses

*continue to be negatively affected by fluctuations in our Google-related business,*" and that the partner network business owned by the Borrower "*continue[s] to see ongoing volatility due to changes enacted by Google in their search Partner Netw*ork." (emphasis added). Thus, the August 2024 Transaction not only stripped valuable assets from the Lenders but also left the Lenders with Collateral that was deteriorating in value.

50. The Borrower continued to be insolvent when it entered into the August 2024 Transaction. ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████

51. ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████.

52. The Borrower's actual intent to hinder and delay repayment of the Term Loan and defraud the Lenders through the November 2023 Transaction and the August 2024 Transaction is exemplified by multiple badges of fraud, including that: (i) there was no business purpose for the transfer of assets to Unrestricted Subsidiary Sonic and to Holdings other than to remove the assets from Plaintiffs' Collateral and avoid having to prepay the Term Loan, (ii) the Borrower was insolvent at the time of both transfers, (iii) the transfers included transfers made to insiders, including asset transfers to Holdings and repayments of unsecured and subordinated debts owed by

23

Case 1:25-cv-09032-VM    Document 1-1    Filed 10/30/25    Page 25 of 39

System1 to trusts in which Blend, Ursini and their relatives were beneficiaries, (iv) the transfers were made to improve the position of the insiders, Blend and Ursini because they had substantial equity holdings which benefited from the transactions, and (v) the Borrower received less than reasonably equivalent value for the transfers to Holdings, Sonic, and the Insider Purchasers in connection with the November 2023 Transaction and *no* consideration for the transfer of the Products Business up the corporate chain in the August 2024 Transaction. The actual intent to defraud is also evidenced by the Borrower's lack of transparency with the Lenders. System1 has provided only a limited amount of information about the transactions and has refused to allow Plaintiffs to examine a purported solvency opinion that System1 obtained from Stout Risius Ross, LLC in connection with the August 2024 Transaction.

53. System1's management has demonstrated that it is neither a responsible nor reliable steward of the business. Its 2024 10-K disclosed that the material weaknesses in internal controls first disclosed in its 2022 10-K (*supra* ¶ 31) *had continued at least through 2024*. Notably, System1 disclosed that it "did not design and maintain effective controls to timely analyze and record the financial statement effects from complex, non-routine transactions, including acquisitions [and] dispositions," which raises serious doubts concerning System1's ability to accurately account for the November 2023 and August 2024 Transactions. System1 also disclosed that:

(i)     "We did not design and maintain an effective control environment commensurate with our financial reporting requirements. Specifically, we lacked a sufficient number of professionals with an appropriate level of accounting knowledge, training and experience to appropriately analyze, record and disclose accounting matters timely and accurately."

(ii)    "We did not design and maintain effective controls in response to the risks of material misstatement. Specifically, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting."

24

(iii)     "We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over (i) the preparation and review of business performance reviews, account reconciliations journal entries, and identification of asset groups and (ii) maintaining appropriate segregation of duties. Additionally, we did not design and maintain controls over the classification and presentation of accounts and disclosures in the consolidated financial statements, including the statement of cash flows."

## IV.    The August 2024 Transaction Breached the Credit Agreement.

### A.    The August 2024 Transaction Breached Section 7.10 of the Credit Agreement.

54.     Section 7.10 provides that Holdings, a subsidiary of System1, Inc. and an intermediate holding company that owns the Borrower, "shall not…convey, sell or otherwise Dispose of substantially all of its assets to another Person" (other than the Borrower and any of its Subsidiaries) <u>unless</u>, among other things, that entity "expressly assumes all of the Obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party."  The Credit Agreement defines "Dispose" broadly to include any "sale, transfer, license, lease or other disposition (whether effected pursuant to a division or otherwise) of any property to any Person." Credit Agreement § 1.01.  It also defines "Person" broadly to include "any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity."  *Id.*  Put simply, Section 7.10 bars Holdings from transferring substantially all of its assets to an entity other than the Borrower and its Subsidiaries unless that entity assumes Holdings' obligations under the Credit Agreement.

55.     In connection with the August 2024 Transaction, Holdings transferred assets with purported fair market value of ███████████████████ up the corporate chain to New Holdco, which subsequently transferred the assets to its newly created subsidiary, S1 Media. Neither New Holdco nor S1 Media are Subsidiaries of the Borrower.[10]  Nor did they assume

---

[10]    The assets were in fact worth significantly more than ███████  Indeed, Blend boasted that the assets were worth more than the entire enterprise value of System1.

Holdings' obligations under the Credit Agreement. By System1's admission, the assets transferred constituted "substantially all" of Holdings' assets: in an August 7, 2025 earnings call Blend boasted that the transferred assets were worth more than the publicly traded enterprise value of the *entire company* (*supra* ¶ 48).

56.     Holdings, therefore, breached Section 7.10 by transferring substantially all of its assets to an entity other than the Borrower and its Subsidiaries that did not assume Holdings' obligations under the Credit Agreement.

**B. The August 2024 Transaction Breached Sections 7.02(r) and 7.06(g) of the Credit Agreement.**

57.     As explained above, the first step of the August 2024 Transaction was to designate certain existing Subsidiaries as Unrestricted Subsidiaries. Section 6.15 of the Credit Agreement provides that the "designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the applicable Restricted Companies therein at the date of designation in an amount equal to the net book value …of the Restricted Companies' Investments therein." Section 7.02 of the Credit Agreement, in turn, restricts the Borrower's ability to make "Investments."[11] Specifically, Section 7.02 provides that "the Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to…make or hold any Investments" other than certain narrow, enumerated exceptions (referred to by market convention as "baskets").

---

[11]    Under the Credit Agreement, an "Investment" means, "as to any Person (a) the purchase or other acquisition for consideration of Equity Interests or debt or other securities of another Person, (b) a loan, advance (in each case, other than any advance to any current or former employee, officer, director, member of management, manager, consultant or independent contractor of the Borrower, any Restricted Subsidiary, or any Parent Company for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution to, or Guarantee of Indebtedness of, another Person, in each case, in exchange for consideration or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person."

58.     In the August 2024 Transaction, System1 relied on the basket in Section 7.02(r), which permits Investments up to the "Available Amount."  As relevant here, Available Amount "means, at any time, an amount equal to:"

> (i)     if positive, an amount equal to the CNI Growth Amount, (provided, that no amount shall be available under this clause…unless the Borrower would be permitted to incur at least $1 under Section 7.03(z); plus

> (ii)    100% of the aggregate amount of contributions to the common capital of the Borrower or the net proceeds of the issuance of Qualified Equity Interests of Holdings (or any direct or indirect parent thereof) contributed to the Borrower to the extent Not Otherwise Applied, in each case, received in cash during the period from and including the Business Day immediately following the Closing Date through and including such time; plus

> (iii)   an amount equal to the sum of (A) in the event any Unrestricted Subsidiary has been redesignated as a Restricted Subsidiary pursuant to Section 6.15 or has been merged, consolidated or amalgamated with or into, or is liquidated into, the Borrower or any Restricted Subsidiary, the amount of the Investments of the Borrower or any Restricted Subsidiary in such Subsidiary made pursuant to Section 7.02(r)(i) (in an amount not to exceed the original amount of such investment) and (B) the fair market value (as reasonably determined by the Borrower) of the property of any Unrestricted Subsidiary that have been transferred, conveyed, or otherwise distributed to the Borrower or any Restricted Subsidiary after the Closing Date from any dividend or other distribution by an Unrestricted Subsidiary.

Credit Agreement § 1.01.

59.     System1 claimed that, immediately prior to the Specified Designations, the Available Amount was equal to approximately $215 million consisting of (i) approximately $120 million of CNI Growth Amount, (ii) approximately $29 million of contributions to the common capital of the Borrower resulting from the acquisition of NextGen Shopping, LLC in March 2022, and (iii) approximately $66 million from Sonic's distribution of the Total System sale proceeds to the Borrower.  These amounts were intentionally and artificially inflated to enable the Borrower to claim that it was permissible to strip the Lenders of their Collateral.  Because these claimed

valuations were not correct, the Borrower's transfers were in breach of Section 7.02(r) of the Credit Agreement.[12]

60.     *First*, the Borrower was not entitled to use any portion of the alleged CNI Growth Amount.  By its terms, the CNI Growth Amount is available only if the Borrower "would be permitted to incur at least $1 under Section 7.03(z)."  Credit Agreement § 1.01.  Pursuant to Section 7.03(z), the Borrower can incur (i) first lien debt only if its First Lien Leverage Ratio does not exceed 2.95:1.00, (ii) junior secured debt only if its Secured Leverage Ratio does not exceed 3.70:1.00, and (iii) unsecured debt only if its Total Leverage Ratio does not exceed 3.95:1.00.[13]

61.     In computing its leverage ratios to justify using the CNI Growth Amount, the Borrower improperly inflated its EBITDA.  For the last twelve months ended June 30, 2024 (the last full quarter before the August 2024 Transaction closed), the System1 publicly reported Adjusted EBITDA of $28.5 million for the Borrower.  By contrast, the compliance certificate delivered to the Administrative Agent under the Credit Agreement (the "Compliance Certificate") represented that the Borrower had EBITDA of $96.6 million for the same time period.  The difference is due largely to a supposed $66.6 million distribution the Borrower received from its

---

[12]    System1 also used the inflated Available Amount to distribute, pursuant to Section 7.06(g) of the Credit Agreement, the Borrower's equity interests in the Owned and Operated Business up the corporate chain through Holdings to a newly created parent entity of Holdings, New Holdco (Step 4 of the August 2024 Transaction, described above (*supra* ¶¶ 44-45)).  In so doing, System1 also breached Section 7.06(g) of the Credit Agreement, which permits Restricted Payments (including dividends) up to the Available Amount.

[13]    Under the Credit Agreement,

"First Lien Leverage Ratio" means "as of any date of determination, the ratio of (a) Consolidated Total Debt that is First Lien Debt to (b) Consolidated EBITDA as of the last day of the most recently ended Test Period, in each case, of the Borrower and its Restricted Subsidiaries on a consolidated basis."

"Secured Leverage Ratio" means "as of any date of determination, the ratio of (a) Consolidated Total Debt that is secured to (b) Consolidated EBITDA as of the last day of the most recently ended Test Period, in each case, of the Borrower and its Restricted Subsidiaries on a consolidated basis."

"Total Leverage Ratio" means "as of the date of determination, the ratio of (a) Consolidated Total Debt that is outstanding on such date of determination (b) Consolidated EBITDA as of the last day of the most recently ended Test Period, in each case, of the Borrower and its Restricted Subsidiaries on a consolidated basis."

28

Unrestricted Subsidiary, Sonic, consisting of proceeds from the Total Security sale. But System1 has historically consolidated its financials, including those of its subsidiary Sonic, in its public filings. The supposed distribution had no impact on the Company's consolidated balance sheet cash or its earnings. Furthermore, the majority of the $66.6 million distribution was used to repurchase $64.9 million of the Term Loan at a 36% discount to par. That distribution was designed to inflate EBITDA to enable the Borrower to claim that the transfer was permitted.

62.     Using System1's reported Adjusted EBITDA of $28.5 million for the Borrower, the First Lien Leverage Ratio (the most lenient of the three tests), was 9.25x, more than three times higher than permitted under Section 7.03(z). Without the Borrower improperly inflating EBITDA, the Borrower could not include the CNI Growth Amount in the Available Amount. By including the CNI Growth Amount in the Available amount, the Borrower breached Sections 7.02(r) and 7.06(g) of the Credit Agreement when it entered into the August 2024 Transaction.

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against Orchid Merger Sub II, LLC and S1 Holdco, LLC)**

63.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

64.     The Credit Agreement is a valid and enforceable agreement.

65.     Plaintiffs are parties to the Credit Agreement.

66.     The Borrower and Holdings are parties to the Credit Agreement.

67.     Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

68.     Section 7.10 of the Credit Agreement provides that: Holdings "shall not…convey, sell or otherwise Dispose of substantially all of its assets to another Person" (other than the

Borrower and any of its Subsidiaries) *unless*, among other things, that entity "expressly assumes all of the Obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party."

69. Holdings breached Section 7.10 of the Credit Agreement by transferring substantially all of its assets to New Holdco, which subsequently transferred the assets to its newly created subsidiary, S1 Media, an entity other than the Borrower and its Subsidiaries.

70. Neither New Holdco nor S1 Media assumed Holdings' obligations under the Credit Agreement following this transfer.

71. Section 7.02(r) permits Investments up to the "Available Amount."

72. Section 7.06(g) of the Credit Agreement permits Restricted Payments up to the "Available Amount."

73. The Borrower breached Sections 7.02(r) and 7.06(g) of the Credit Agreement when it consummated the August 2024 Transaction. The Borrower intentionally and improperly inflated the Available Amount, defined in Section 1.01 of the Credit Agreement, to make a prohibited Investment in Unrestricted Subsidiaries pursuant to Section 7.02(r) of the Credit Agreement and a prohibited Restricted Payment up the corporate chain pursuant to 7.06(g) of the Credit Agreement.

74. The prohibited distributions stripped the Lenders of their Collateral in breach of Sections 1.01, 7.02, and 7.06 of the Credit Agreement, which permits Defendant to make Restricted Payments and Investments up to the Available Amount.

75. Plaintiffs have suffered damages as a result of Defendants' breaches in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Intentional Fraudulent Transfer
### (Against Orchid Merger Sub II, LLC, S1 Holdco, LLC, and Sonic Newco, LLC)

76.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

77.     Prior to, at the time of, and following the November 2023 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

78.     The November 2023 Transaction included multiple transfers of property, including: (i) the Borrower's contribution of 49.99% of the equity interests in Total Security down to Sonic; (ii) the Borrower's dividend of a portion of the equity interests in Total Security equal to the value of the equity interests in System1, Inc. to be surrendered by the Purchasers up to Holdings, leaving the Borrower with approximately 38.39% of the equity of Total Security prior to the Total Security sale; and (iii) all related transfers that facilitated the foregoing. (collectively, the "Total Security Transfers").  The Borrower received no consideration in connection with either of the Total Security Transfers.

79.     The Total Security Transfers made by the Borrower were made with the actual intent to hinder, delay, or defraud the Borrower's creditors, including Plaintiffs.  Such intent is evident from the presence of multiple badges of fraud.

80.     *First*, there was no business purpose for the transfer of assets to Unrestricted Subsidiary, Sonic, and to Holdings other than to remove the assets from Plaintiffs' Collateral and avoid having to prepay the Term Loan.

81.     *Second*, the Borrower was insolvent at the time of the Total Security Transfers or became insolvent shortly after the Total Security Transfers as a result thereof.  Defendants knew

31

this. They knew that (i) System1's financial performance was deteriorating, (ii) trading levels of the Term Loans were well below par, which indicated that the Borrower was insolvent and in financial distress, and (iii) ████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

82.     *Third*, the Total Security Transfers included multiple transfers to insiders, including asset transfers to Holdings and repayments of unsecured and subordinated debts owed by System1 to trusts in which Blend, Ursini and their relatives were beneficiaries.

83.     *Fourth*, based on their substantial equity holdings, Blend and Ursini had clear motives to transfer assets from the Lenders' Collateral to entities outside the Lenders' Collateral where they would benefit System1's shareholders to the detriment of the Lenders.

84.     *Fifth*, the consideration that the Borrower received from the Total Security Transfers was worth significantly less than the $400 million of assets transferred by the Borrower.

85.     The Total Security Transfers were made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs. The Total Security Transfers are therefore in violation of, and voidable under, Cal. Civ. Code § 3439.04(a)(1).

86.     Accordingly, the Total Security Transfers and any and all proceeds or products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(1), 3439.07, and 3439.08(b).

### THIRD CAUSE OF ACTION
**Constructive Fraudulent Transfer**
**(Against Orchid Merger Sub II, LLC, S1 Holdco, LLC, and Sonic Newco, LLC)**

87.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

88.     Prior to, at the time of, and following the November 2023 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

89.     The November 2023 Transaction included multiple transfers of property, in the form of the Total Security Transfers.

90.     The Total Security Transfers made by the Borrower were made by an insolvent entity without receiving reasonably equivalent value.  The Borrower contributed 49.99% of the equity in Total Security to Sonic for no consideration.  Similarly, the Borrower distributed equity in Total Security via dividend to Holdings for no consideration.

91.     The only purpose of the Total Security Transfers was to strip assets from the Borrower so as to avoid being required to use the proceeds of the Total Security sale to repay the Term Loan, and so that the Lenders' liens would not attach to the sale proceeds.

92.     The Borrower was insolvent on the date of the Total Security Transfers; was left with unreasonably small capital on the date of the Total Security Transfers or as a result of the Total Security Transfers; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.  Defendants knew this.  They knew that (i) the Borrower's financial performance was deteriorating, (ii) trading levels of the Term Loans were well below par, which indicated that the Borrower was in distress, and (iii) ███████████████████████ ████████████████████████████████████████████ ███████████.

93.     By virtue of the foregoing, the Total Security Transfers were constructive fraudulent transfers in violation of and voidable under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

94.     Accordingly, the Total Security Transfers and any proceeds or products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, 3439.07, and 3439.08(b).

### FOURTH CAUSE OF ACTION
**Intentional Fraudulent Transfer**
**(Against Orchid Merger Sub II, LLC and S1 Media, LLC)**

95.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

96.     Prior to, at the time of, and following the August 2024 Transaction, Plaintiffs were creditors of the Borrower virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

97.     The August 2024 Transaction included multiple transfers of property, in the form of (i) Privacy, NextGen, MQH, and MQSH's transfers of the Products Business down to their newly created subsidiaries, New Privacy, New NextGen, New MQH, and New MQSH; (ii) New Privacy, New NextGen, New MQH, and New MQSH's transfers of the Products Business up to the Borrower through OpCo and System1 S1, Inc.; (iii) the distribution of the Products Business up the corporate chain from the Borrower through Holdings and New Holdco to S1 Media; and (iv) all related transfers that facilitated the foregoing (such transfers, the "S1 Media Transfers").

98.     The S1 Media Transfers transferred property with the actual intent to hinder, delay, or defraud the Borrower's creditors, including Plaintiffs.  Such intent is evident from the presence of multiple badges of fraud.

99.     *First*, System1 utilized the S1 Media Transfers to remove assets from the Borrower and place them outside of the Collateral securing the Term Loan under the Credit Agreement. Before the August 2024 Transaction, the Products Business was pledged to secure the Term Loan.

In connection with the August 2024 Transaction, the Borrower removed these assets previously available to Plaintiffs and transferred them exclusively to S1 Media for the purpose of putting them beyond the reach of Plaintiffs and the other lenders under the Credit Agreement.

100.     *Second*, the Borrower received little, if any consideration in exchange for the S1 Media Transfers.  The S1 Media Transfers were effectively dividends to parent companies.

101.     *Third*, there was no business purpose for the S1 Media Transfers, and System1 has never articulated one.  The only purpose of the S1 Media Transfers was to strip assets from the Borrower, so that System1 shareholders could benefit from the S1 Media Transfers at the expense of Plaintiffs.

102.     *Fourth*, the Borrower was insolvent at the time of the S1 Media Transfers or became insolvent shortly after the S1 Media Transfers as a result thereof.

103.     *Fifth*, the S1 Media Transfers included transfers made to insiders, including Holdings and New Holdco.  New Holdco's insider status is evidenced by, among other things, its 100% ownership of Holdings.

104.     As shown through multiple badges of fraud, the S1 Media Transfers were made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs.  The S1 Media Transfers are therefore in violation of and voidable under Cal. Civ. Code § 3439.04(a)(1).

105.     Accordingly, the S1 Media Transfers and all proceeds and products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(1), 3439.07, and 3439.08(b).

### FIFTH CAUSE OF ACTION
### Constructive Fraudulent Transfer
### (Against Orchid Merger Sub II, LLC and S1 Media, LLC)

106.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

107.   Prior to, at the time of, and following the August 2024 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

108.   The August 2024 Transaction included multiple transfers of property, in the form of the S1 Media Transfers.

109.   The S1 Media Transfers were made by an insolvent entity without receiving reasonably equivalent value because the only purpose of the S1 Media Transfers was to strip assets from the Borrower and distribute those assets up the corporate chain to S1 Media, a newly created entity that was not a Loan Party under the Credit Agreement, thereby removing these assets from the Collateral securing the Term Loan.

110.   The Borrower was insolvent on the date of the S1 Media Transfers; was left with unreasonably small capital on the date of the S1 Media Transfers or as a result of the S1 Media Transfers; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

111.   By virtue of the foregoing, the S1 Media Transfers were constructive fraudulent transfers in violation of and voidable under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

112.   Accordingly, the S1 Media Transfers should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, 3439.07, and 3439.08(b).

36

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court order:

1)      The avoidance and recovery of all transfers (and all proceeds and products thereof) made by the Borrower for the benefit of Holdings and Sonic in connection with the November 2023 Transaction;

2)      the avoidance and recovery of all transfers (and all proceeds and products thereof) made by the Borrower for the benefit of S1 Media in connection with the August 2024 Transaction;

3)      money damages in an amount to be determined at trial, including compensatory and punitive damages for the Borrower and Holdings' breaches of the Credit Agreement;

4)      payment by Defendants of the costs and disbursements of this action, together with attorneys' fees incurred by Plaintiffs in connection with this action; and

5)      such other and further relief as this Court may deem just and proper.


[*Remainder of page intentionally left blank*]

Dated: New York, New York          Respectfully submitted,
       September 30, 2025

GLENN AGRE BERGMAN & FUENTES LLP

By: /s/ Andrew K. Glenn
Andrew K. Glenn
Trevor J. Welch
Olga L. Fuentes-Skinner
Agustina G. Berro
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Tel: (212) 970-1600
aglenn@glennagre.com
twelch@glennagre.com
ofuentes@glennagre.com
aberro@glennagre.com

*Attorneys for Plaintiffs*