**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALINEA CLO, LTD., ANNISA CLO, LTD., BARDOT CLO, LTD., CARBONE CLO, LTD., INVESCO CLO 2021-1, LTD., INVESCO CLO 2021-2, LTD., INVESCO CLO 2021-3, LTD., INVESCO CLO 2022-1, LTD., INVESCO CLO 2022-2, LTD., INVESCO CLO 2022-3, LTD., INVESCO U.S.  CLO 2023-1, LTD., INVESCO U.S. CLO 2023-2, LTD., INVESCO U.S.  CLO 2024-1, LTD., DIVERSIFIED CREDIT PORTFOLIO LTD., INVESCO FLOATING RATE ESG FUND, MILOS CLO, LTD., HARBOURVIEW CLO VII-R LTD., INVESCO PEAK NINE, LP, RECETTE CLO, LTD., RISERVA CLO, LTD., INVESCO SAKURA US SENIOR SECURED FUND, INVESCO SENIOR FLOATING RATE FUND, INVESCO SENIOR INCOME TRUST, INVESCO SENIOR LOAN FUND, INVESCO SSL FUND LLC, INVESCO TETON FUND LLC, UPLAND CLO, LTD., VERDE CLO, LTD., INVESCO ZODIAC FUNDS – INVESCO EUROPEAN SENIOR LOAN FUND, INVESCO ZODIAC FUNDS – INVESCO US SENIOR LOAN FUND, ARTISAN HIGH INCOME FUND, ARTISAN FLOATING RATE FUND, ARTISAN CREDIT OPPORTUNITIES MASTER FUND LP, ELMWOOD CLO I LTD., ELMWOOD CLO II, LTD., ELMWOOD CLO III, LTD., ELMWOOD CLO IV, LTD., ELMWOOD CLO V LTD., ELMWOOD CLO VI LTD., ELMWOOD CLO VII LTD., ELMWOOD CLO VIII LTD., ELMWOOD CLO IX LTD., ELMWOOD CLO X, LTD., ELMWOOD CLO XI, LTD., ELMWOOD CLO XII, LTD., ELMWOOD CLO 14 LTD., ELMWOOD CLO 15 LTD., ELMWOOD CLO 16 LTD., ELMWOOD CLO 17 LTD., ELMWOOD CLO 18 LTD., ELMWOOD CLO 19 LTD., ELMWOOD CLO 20 LTD., ELMWOOD CLO 21 LTD., ELMWOOD CLO 29 LTD., ELMWOOD CLO 33 LTD., ELMWOOD CLO 36 LTD., PALMER SQUARE BDC FUNDING I LLC, PALMER SQUARE CLO 2014-1, LTD., PALMER SQUARE CLO 2015-1, LTD., PALMER SQUARE CLO 2015-2, LTD.,          PALMER SQUARE CLO 2018-1 LTD., PALMER SQUARE CLO 2018-2, LTD., PALMER SQUARE CLO 2018- | Civil Case No. 1:25-cv-09032-VM<br><br>**DEFENDANTS' ANSWER TO PLAINTIFFS' AMENDED COMPLAINT** |

3, LTD., PALMER SQUARE CLO 2019-1, LTD., PALMER SQUARE CLO 2020-3, LTD., PALMER SQUARE CLO 2021-1, LTD., PALMER SQUARE CLO 2021-2, LTD., PALMER SQUARE CLO 2021-4, LTD., PALMER SQUARE CREDIT FUNDING 2019-1, LTD., PALMER SQUARE FLOATING RATE FUND LLC, CERBERUS CORPORATE CREDIT FUND LP, CERBERUS N-1 FUNDING LLC, CERBERUS ASRS FUNDING LLC, CERBERUS SWC LEVERED HOLDINGS II LP, CERBERUS REDWOOD LEVERED LOAN OPPORTUNITIES FUND A, L.P., CERBERUS REDWOOD LEVERED B LLC, CERBERUS ND CREDIT HOLDINGS LLC, CERBERUS CAVALIERS LEVERED LOAN OPPORTUNITIES FUND, LLC, CERBERUS KRS LEVERED LLC, CERBERUS STEPSTONE CREDIT HOLDINGS LLC, RELIANCE STANDARD LIFE INSURANCE COMPANY, CERBERUS OFFSHORE UNLEVERED LOAN OPPORTUNITIES MASTER FUND IV, L.P., CERBERUS LEVERED IV HOLDINGS LLC, CERBERUS OFFSHORE LEVERED IV LLC, CERBERUS AOZ LOAN OPPORTUNITIES FUND, L.P., CERBERUS 2112 LEVERED LLC, CERBERUS RR LEVERED LLC, CINNABAR 2021 DIRECT LENDING LIMITED, CERBERUS LOAN FUNDING XXXVII, L.P., CERBERUS C- 1 LEVERED II LLC, CERBERUS LOAN FUNDING XXXVIII L.P., CERBERUS REDWOOD LEVERED B II LLC, CERBERUS LOAN FUNDING XXXIX L.P., CERBERUS LOAN FUNDING XL, LLC, CERBERUS LOAN FUNDING XLI, LLC, VENTURE XV CLO, LIMITED, VENTURE XIX CLO, LIMITED, VENTURE XXII CLO, LIMITED, VENTURE XXIII CLO, LTD., VENTURE XXVI CLO, LTD., VENTURE XXVII CLO, LTD., VENTURE XXIX CLO, LTD., VENTURE XXVIII CLO, LTD., VENTURE 28A CLO, LTD., VENTURE XXX CLO, LTD., VENTURE 31 CLO, LTD., VENTURE 33 CLO, LTD., VENTURE 32 CLO, LTD., VENTURE 35 CLO, LTD., VENTURE 34 CLO, LTD., VENTURE 36 CLO, LTD., VENTURE 37 CLO, LTD., VENTURE 38 CLO, LTD., VENTURE 41 CLO,

LTD., VENTURE 42 CLO, LTD., VENTURE 43
CLO, LTD., VENTURE 44 CLO, LTD., VENTURE
45 CLO, LTD., and VENTURE 46 CLO, LTD.,

*Plaintiffs,*

v.

ORCHID MERGER SUB II, LLC, S1 MEDIA, LLC,
S1 HOLDCO, LLC, SONIC NEWCO, LLC,
OPENMAIL2, LLC, STANLEY BLEND in his
capacity as Trustee of the LONE STAR FRIENDS
TRUST, and JACKSON HOLE TRUST COMPANY
as Trustee of the CEE HOLDINGS TRUST,

*Defendants.*

Pursuant to Federal Rules of Civil Procedure 8(b), 8(c), and 15(a)(3) and the Civil Case
Management Plan and Scheduling Order entered by the Court on December 5, 2025 (ECF No. 21),
Defendants hereby answer the Amended Complaint (ECF No. 11) of all Plaintiffs in the above-
captioned action as follows. The Amended Complaint's section headings are carried over for
reference only, and Defendants deny any allegations contained in the section headings.

By submitting this Answer, Defendants expressly reserve and do not waive any applicable
rights, defenses, or objections. Defendants also expressly reserve the right to amend this Answer
and its affirmative defenses based on, *inter alia*, facts learned during discovery and Defendants'
ongoing investigation of Plaintiffs' claims. Unless expressly stated herein, nothing in this Answer
should be construed as an admission by Defendants of any facts set forth in the Amended
Complaint. Defendants make no representations, concessions, or admissions regarding the
relevance or appropriateness of any facts set forth in the Amended Complaint.

## AS TO PLAINTIFFS' AMENDED COMPLAINT

## NATURE OF THE ACTION

1.      In January 2022, Plaintiffs, together with certain non-party lenders, extended a $400 million loan (the "Term Loan") to the Borrower (an indirect subsidiary of System1) secured by a first-priority lien on substantially all of the Borrower's and the Guarantors' assets (the "Collateral").[1]  Less than two years after entering into the Term Loan, the Borrower's financial condition began to deteriorate.  In November 2023 and August 2024, the Borrower unlawfully transferred valuable assets from Plaintiffs' Collateral to entities outside Plaintiffs' Collateral for the benefit of System1's insiders and shareholders.[2]  By System1's own admission, the Borrower was insolvent at the time of each transaction.  The transfers of these assets are voidable as both intentional and constructive fraudulent transfers under California's Uniform Voidable Transactions Act because the Borrowers made these transfers (i) in return for less than reasonably equivalent value while the Borrower was insolvent, and (ii) with the actual intent to hinder, delay, and defraud the Lenders.[3]  System1 designed these elaborate, multi-step transactions to move assets to entities not included in Plaintiffs' Collateral while circumventing the Credit Agreement's

---

[1]    The Term Loan was issued pursuant to that certain Credit and Guarantee Agreement, dated as of January 27, 2022 by and among Orchid Merger Sub II, LLC, as the Borrower, S1 Holdco, LLC, as Holdings, the Subsidiaries of the Borrower from time to time party thereto, the lenders from time to time party thereto Bank of America, N.A. as Administrative Agent, Swing Line Lender and L/C Issuer, and Bank of America, N.A. as Lead Arranger and Bookrunner (as amended, restated, and/or modified from time to time, the "Credit Agreement").

Capitalized terms not defined herein shall have the meanings ascribed to them in the Credit Agreement.

[2]    Plaintiffs collectively hold more than 50% of the outstanding amount of the loans issued under the Credit Agreement and accordingly constitute the "Required Lenders," as that term is defined in the Credit Agreement.

[3]    Under the New York Uniform Voidable Transactions Act's ("NY UVTA") choice of law provision, New York courts apply the local law of the jurisdiction in which the debtor is located at the time a challenged transfer is made or an obligation is incurred for fraudulent conveyance claims.  See N.Y. Debt. & Cred. Law § 279(b).  Under the NY UVTA, a corporate debtor is "located" at its principal place of business or chief executive office.  N.Y. Debt. & Cred. Law §§ 279(a)(2) and (a)(3).

provisions that prohibited the transfers or at least required the Borrower to use the proceeds of the sale of the Collateral to prepay the Term Loan.

**Answer:** Defendants admit that Plaintiffs extended a $400 million loan to the Borrower. The allegations contained in the first sentence of Footnote 1 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants assert that the Credit and Guarantee Agreement referenced in Footnote 1 speaks for itself, and respectfully refer the Court to the Credit and Guarantee Agreement for a complete and accurate description of its contents. Defendants lack knowledge or information sufficient to admit or deny the allegations in Footnote 2, and on that basis deny the allegations in Footnote 2. The allegations contained in Footnote 3 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that the New York Uniform Voidable Transactions Act referenced in Footnote 3 contains a choice of law provision, and respectfully refer the Court to the statute for a complete and accurate description of its contents. The remaining allegations constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 1.

2.    This action seeks to avoid these transactions as intentional and constructive fraudulent transfers as well as to recover damages for breach of the Credit Agreement.

**Answer:** The allegations contained in Paragraph 2 characterize Plaintiffs' Amended Complaint to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 2.

* * * * *

3.    System1 is a publicly traded company founded by its Chief Executive Officer and Chairman of the Board of Directors (the "Board"), Michael Blend, and Chief Operating Officer,

Charles Ursini, who also sits on the Board. Blend and Ursini are among System1's largest shareholders. In 2023, they also became significant unsecured creditors of System 1. In April 2023, when System1 was in the midst of a liquidity crisis, Blend and Ursini caused trusts under their control, Lone Star and CEE, to extend unsecured loans to System1 (defined *infra* as the Insider Debts) in the combined amount of $20 million. Additionally, in October 2023, immediately prior to the Borrower's first transfer of assets away from the Lenders' Collateral, Blend and Ursini caused Defendant Openmail2 to extend an unsecured loan to System1 in the amount of $2.5 million.

**Answer:** Defendants admit that System1 is a publicly traded company co-founded by its Chief Executive Officer and Chairman of the Board of Directors (the "Board"), Michael Blend, and Chief Operating Officer, Charles Ursini, who also currently sits on the Board. Defendants also admit that Blend and Ursini are two of System1's shareholders and that Lone Star and CEE extended unsecured loans to System1 in the combined amount of $20 million in April 2023. Additionally, Defendants admit that Openmail2 extended an unsecured loan to System1 in the amount of $2.5 million in October 2023. Defendants otherwise deny the allegations in Paragraph 3.

4.    System1's financial performance started to deteriorate in late 2022. To salvage their underwater personal equity stakes and significant unsecured debt holdings, Blend and Ursini caused System1 to execute two transactions that transferred the Borrower's most valuable assets away from the Lenders' Collateral to unrestricted subsidiaries not subject to the Lenders' liens for the benefit of Blend, Ursini, and System1's other shareholders.

**Answer:** Defendants deny the allegations in Paragraph 4.

5.    In November 2023, Blend and Ursini caused the Borrower to enter into a series of transactions which resulted in the transfer of assets worth more than $400 million to an insider

investor group (the "<u>Insider Purchasers</u>" and such transaction the "<u>November 2023 Transaction</u>").[4]
The Insider Purchasers were led by affiliates of Avance Investment Management, LLC,
("<u>Avance</u>") and Just Develop It Limited ("<u>JDI</u>").[5]  Prior to the November 2023 Transaction, the
transferred assets were owned by the Borrower and were part of Plaintiffs' Collateral.  Pursuant to
Section 2.06 of the Credit Agreement, if the Borrower sold any of those assets directly, it would
have had to apply the proceeds of the sale to prepay the Term Loan.  To circumvent this
requirement, the Borrower first transferred the assets to a newly-designated Unrestricted
Subsidiary.  Under the Credit Agreement, assets held by Unrestricted Subsidiaries are not part of
Plaintiffs' Collateral.  Consequently, the proceeds from the sale of those assets were not required
to be used to prepay the Term Loan.  The Unrestricted Subsidiary then sold the assets it had
received from the Borrower to the Insider Purchasers.  The Insider Purchasers then transferred the
cash purchase price to the Unrestricted Subsidiary, where it remained outside Plaintiffs' Collateral.
Finally, part of the purchase price was used to repay the Insider Debts to Openmail2, Lone Star,
and CEE *at par, plus "closing" fees*.  Prior to the November 2023 Transaction, the Insider Debts
were subordinated to the Lenders' Term Loan and, thus, could only be repaid after the Term Loan
was repaid.

 **<u>Answer</u>**: Defendants admit that the Officer's Certificate referenced in Footnote 4 was
executed in connection with the November 2023 transaction and places the value of the assets sold
at approximately $400 million, but Defendants assert that the Officer's Certificate speaks for itself
and respectfully refer the Court to the Officer's Certificate for a complete and accurate description

---

[4] The Officer's Certificate, dated December 8, 2023, executed by the Borrower in connection with the November 2023 Transaction indicates that the market value of the assets sold was approximately $400 million.

[5] At the time of the November 2023 Transaction, JDI was one of System1's largest shareholders, and Christopher Philipps, the controlling shareholder and a director of JDI, also served on the Board.  John Civantos, a senior partner at Avance, is a current member of the Board.

of its contents. Defendants admit that the Borrower entered into a transaction in November 2023 involving a series of steps, but Defendants otherwise deny the allegations in sentences one and two of Paragraph 5. Defendants admit that, prior to the November 2023 transaction, the transferred assets were owned by the Borrower and were part of Plaintiffs' collateral. With respect to Footnote 5, Defendants admit that JDI was a shareholder of System1 and that Christopher Phillips was the controlling shareholder and a director of JDI and sat on the Board. Defendants further admit that John Civantos was a senior partner at Avance at the time and currently sits on the Board. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Footnote 5 and on that basis deny the remaining allegations in Footnote 5.

Defendants also admit that the Credit Agreement referenced in Paragraph 5 contains Section 2.06, and respectfully refer the Court to that provision for a complete and accurate description of its contents. Defendants deny the allegations in the fifth sentence of Paragraph 5. The allegations contained in the sixth and seventh sentences of Paragraph 5 (beginning with "Under the Credit Agreement" and ending with "to prepay the Term Loan") constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that proceeds from the sale of assets held by Unrestricted Subsidiaries were not required to be used to prepay the Term Loan, but otherwise deny the allegations in those sentences. The allegations contained in the eighth and ninth sentences of Paragraph 5 also constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that the Unrestricted Subsidiary sold the assets it received from the Borrower, and that the purchase price was transferred by the purchaser to an Unrestricted Subsidiary, which was outside of Plaintiffs' collateral. Defendants otherwise deny the allegations in those sentences. Defendants admit that part of the consideration received from the sale of the

assets was used to repay outstanding loans owed to Openmail2, Lone Star, and CEE at par, plus "closing" fees. Defendants otherwise deny the allegations in Paragraph 5.

6.    The transfer of assets from Plaintiffs' Collateral to an Unrestricted Subsidiary in the November 2023 Transaction significantly impaired the value of the Collateral securing Plaintiffs' Term Loan.  At the time of the November 2023 Transaction, the Borrower was insolvent and was left undercapitalized thereafter.  Indeed, the markets recognized that the Borrower was insolvent at that time, as prior to the November 2023 Transaction, the Term Loan was trading at 65 cents on the dollar.  By December 2023, the debt traded down to 55 cents on the dollar, and has since traded down further to 50 cents on the dollar in 2025.

**Answer:** Defendants deny the allegations in Paragraph 6.

7.    In January 2024, System1 admitted that the Borrower was insolvent, undercapitalized, and unable to pay its debts immediately before and after the transaction.  At that time, System 1's management acknowledged to the Lenders that System1's "anticipated 2024 EBITDA and free cash flow [would be] insufficient to service its term loan debt."  By System1's admission, the Borrower was undercapitalized and unable to pay its debts as they became due immediately before and following the November 2023 Transaction.

**Answer:** Defendants admit that the quotation in the second sentence derives from a presentation prepared by System1 in January 2024. Defendants assert that the presentation referenced in Paragraph 7 speaks for itself, and respectfully refer the Court to the presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 7.

8.    System1's malfeasance did not end there.  In August 2024, the Borrower transferred its Products Business (as defined below) to a newly-created, indirect parent company of the Borrower that was not subject to the security interests of the Plaintiffs and the other lenders (the

"August 2024 Transaction").  The value of the Products Business, by Blend's own admission to the investing public, was more than the entire enterprise value of System1.  The August 2024 Transaction had no business purpose other than to transfer additional assets out of Plaintiffs' Collateral and into a holding company outside of Plaintiffs' reach solely for the benefit of System1's shareholders.  Indeed, in an August 2025 earnings call, Blend touted the value of the transaction to System1's shareholders.  He told analysts that the investing public had overlooked the value of these assets that were no longer included in the Collateral but were now available to System1 shareholders.  This second transfer of assets outside of the Lenders' Collateral for the benefit of System1's shareholders also should be avoided as an intentional and constructive fraudulent transfer.

**Answer:** The third sentence (beginning, "The value of the Products Business") and the sixth sentence (beginning, "He told analysts") of Paragraph 8 reference Michael Blend's statements during an August 7, 2025 Earnings Call, and Defendants assert that the transcript of the August 7, 2025 Earnings Call speaks for itself and respectfully refer the Court to the full transcript for a complete and accurate description of its contents. The remaining allegations in Paragraph 8 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 8.

9.     The August 2024 Transaction also breached multiple provisions of the Credit Agreement designed to restrict the Borrower's ability to transfer assets out of the Lenders' Collateral.  Specifically, the August 2024 Transaction violated, among other sections, (i) Section 7.10 of the Credit Agreement, which bars the Borrower from transferring substantially all of its assets without the transferee assuming the Term Loan obligations (which did not occur here), (ii) Section 7.02 of the Credit Agreement, which limits the Borrower's ability to transfer assets to

Unrestricted Subsidiaries, and (iii) Section 7.06 of the Credit Agreement, which limits the Borrower's ability to make dividends.

**Answer:** The allegations contained in Paragraph 9 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny any breach of the Credit Agreement; and Defendants admit that the Credit Agreement referenced in Paragraph 9 contains Sections 7.10, 7.02, and 7.06, and respectfully refer the Court to those provisions for a complete and accurate description of their contents.

10.    This action seeks to redress the demonstrable and significant harm suffered by Plaintiffs by seeking (i) avoidance of these transactions as intentional and constructive fraudulent transfers pursuant to the California Uniform Voidable Transfer Act, and (ii) money damages sufficient to compensate the Lenders for the harms caused by Borrower and Holdings' breaches of the Credit Agreement.

**Answer:** The allegations contained in Paragraph 10 characterize the Amended Complaint to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 10.

**PARTIES**

11.    Plaintiffs Alinea CLO, Ltd., Annisa CLO, Ltd., Bardot CLO, Ltd., Carbone CLO, Ltd., Invesco CLO 2021-1, Ltd., Invesco CLO 2021-2, Ltd., Invesco CLO 2021-3, Ltd., Invesco CLO 2022-1, Ltd., Invesco CLO 2022-2, Ltd., Invesco CLO 2022-3, Ltd., Invesco U.S.  CLO 2023- 1, Ltd., Invesco U.S.  CLO 2023-2, Ltd., Invesco U.S.  CLO 2024-1, Ltd., Diversified Credit Portfolio Ltd., Invesco Floating Rate ESG Fund, Milos CLO, Ltd., Harbourview Clo VII-R Ltd., Invesco Peak Nine, LP, Recette CLO, Ltd., Riserva CLO, Ltd., Invesco Sakura US Senior Secured Fund, Invesco Senior Floating Rate Fund, Invesco Senior Income Trust, Invesco Senior Loan Fund, Invesco SSL Fund LLC, Invesco Teton Fund LLC, Upland CLO, Ltd.  Verde CLO, Ltd.

Invesco Zodiac Funds – Invesco European Senior Loan Fund, and Invesco Zodiac Funds – Invesco US Senior Loan Fund (collectively defined above as the Invesco Lenders) are investment funds incorporated in Delaware, the Cayman Islands, Jersey, Channel Islands, or Luxembourg. The Invesco Lenders are managed by Invesco Senior Secured Management, Inc., an investment management company headquartered in New York, New York.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 11 and on that basis deny the allegations in Paragraph 11.

12.     Plaintiffs Artisan High Income Fund, Artisan Floating Rate Fund, and Artisan Credit Opportunities Master Fund LP (collectively defined above as the Artisan Lenders) are investment funds incorporated in Wisconsin or the Cayman Islands. The Artisan Lenders are managed by Artisan Partners Limited Partnership, an investment management company headquartered in Milwaukee, Wisconsin.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 12 and on that basis deny the allegations in Paragraph 12.

13.     Plaintiffs Elmwood CLO I Ltd., Elmwood CLO II, Ltd., Elmwood CLO III, Ltd., Elmwood CLO IV, Ltd., Elmwood CLO V Ltd., Elmwood CLO VI Ltd., Elmwood CLO VII Ltd., Elmwood CLO VIII Ltd., Elmwood CLO IX Ltd., Elmwood CLO X, Ltd., Elmwood CLO XI, Ltd., Elmwood CLO XII, Ltd., Elmwood CLO 14 Ltd., Elmwood CLO 15 Ltd., Elmwood CLO 16 Ltd., Elmwood CLO 17 Ltd., Elmwood CLO 18 Ltd., Elmwood CLO 19 Ltd., Elmwood CLO 20 Ltd., Elmwood CLO 21 Ltd., Elmwood CLO 29 Ltd., Elmwood CLO 33 Ltd., and Elmwood CLO 36 Ltd. (collectively defined above as the Elmwood Lenders) are investment funds incorporated in the Cayman Islands. The Elmwood Lenders are managed by Elmwood Asset Management, an investment management company headquartered in New York, New York.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 13 and on that basis deny the allegations in Paragraph 13.

14.     Plaintiffs Palmer Square BDC Funding I LLC, Palmer Square CLO 2014-1, Ltd., Palmer Square CLO 2015-1, Ltd., Palmer Square CLO 2015-2, Ltd., Palmer Square CLO 2018-1 Ltd., Palmer Square CLO 2018-2, Ltd., Palmer Square CLO 2018-3, Ltd., Palmer Square CLO 2019-1, Ltd., Palmer Square CLO 2020-3, Ltd., Palmer Square CLO 2021-1, Ltd., Palmer Square CLO 2021-2, Ltd., Palmer Square CLO 2021-4, Ltd., Palmer Square Credit Funding 2019-1, Ltd., and Palmer Square Floating Rate Fund LLC (collectively defined above as the Palmer Square Lenders) are investment funds managed by Palmer Square Capital Management LLC, an investment management company headquartered in Mission Woods, Kansas.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 14 and on that basis deny the allegations in Paragraph 14.

15.     Plaintiffs Cerberus Corporate Credit Fund LP, Cerberus N-1 Funding LLC, Cerberus ASRS Funding LLC, Cerberus SWC Levered Holdings II LP, Cerberus Redwood Levered Loan Opportunities Fund A, L.P., Cerberus Redwood Levered B LLC, Cerberus ND Credit Holdings LLC, Cerberus Cavaliers Levered Loan Opportunities Fund, LLC, Cerberus KRS Levered LLC, Cerberus StepStone Credit Holdings LLC, Reliance Standard Life Insurance Company, Cerberus Offshore Unlevered Loan Opportunities Master Fund IV, L.P., Cerberus Levered IV Holdings LLC, Cerberus Offshore Levered IV LLC, Cerberus AOZ Loan Opportunities Fund, L.P., Cerberus 2112 Levered LLC, Cerberus RR Levered LLC, Cinnabar 2021 Direct Lending Limited, Cerberus Loan Funding XXXVII, L.P., Cerberus C-1 Levered II LLC, Cerberus Loan Funding XXXVIII L.P., Cerberus Redwood Levered B II LLC, Cerberus Loan Funding XXXIX L.P., Cerberus Loan Funding XL, LLC, and Cerberus Loan Funding XLI, LLC (collectively defined above as the Cerberus Lenders) are investment funds managed by

Cerberus Capital Management, L.P., an investment management company headquartered in New York, New York.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 15 and on that basis deny the allegations in Paragraph 15.

16.    Plaintiffs Venture XV CLO, Ltd., Venture XIX CLO, Ltd., Venture XXII CLO, Ltd., Venture XXIII CLO, Ltd., Venture XXVI CLO, Ltd., Venture XXVII CLO, Ltd., Venture XXIX CLO, Ltd., Venture XXVIII CLO, Ltd., Venture 28A CLO, Ltd., Venture XXX CLO, Ltd., Venture 31 CLO, Ltd., Venture 33 CLO, Ltd., Venture 32 CLO, Ltd., Venture 35 CLO, Ltd., Venture 34 CLO, Ltd., Venture 36 CLO, Ltd., Venture 37 CLO, Ltd., Venture 38 CLO, Ltd., Venture 41 CLO, Ltd., Venture 42 CLO, Ltd., Venture 43 CLO, Ltd., Venture 44 CLO, Ltd., Venture 45 CLO, Ltd., and Venture 46 CLO, Ltd. (collectively defined above as the MJX Lenders) are investment funds managed by MJX Asset Management LLC, an investment management company headquartered in New York, New York.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 16 and on that basis deny the allegations in Paragraph 16.

17.    Defendant Orchid Merger Sub II, LLC (defined above as the Borrower) is a Delaware limited liability company.  The Borrower is a wholly-owned subsidiary of Defendant Holdings.

**Answer:** Defendants admit the allegations in Paragraph 17.

18.    Defendant S1 Media, LLC (defined above as S1 Media) is a Delaware limited liability company.  S1 Media is a wholly-owned subsidiary of non-party System1, Inc.

**Answer:** Defendants admit that S1 Media is a Delaware limited liability company. Defendants otherwise deny the allegations in Paragraph 18.

19.     Defendant S1 Holdco, LLC (defined above as Holdings) is a Delaware limited liability company.  Holdings is a wholly-owned subsidiary of non-party System1, Inc.

**Answer:** Defendants admit that Holdings is a Delaware limited liability company. Defendants otherwise deny the allegations in Paragraph 19.

20.     Defendant Sonic Newco, LLC (defined above as Sonic), is a Delaware limited liability company and wholly-owned subsidiary of the Borrower.

**Answer:** Defendants admit the allegations in Paragraph 20.

21.     Defendant Openmail2, LLC (defined above as Openmail2) is a Delaware limited liability company which is principally owned and managed by trusts established for the benefit of System1 insiders, Michael Blend and Charles Ursini.  Upon information and belief, Openmail2 maintains its principal place of business in Los Angeles, California.

**Answer:** Defendants admit that Openmail2 is a Delaware limited liability company with a principal place of business in Los Angeles, California, but otherwise deny the allegations in Paragraph 21.

22.     Lone Star Friends Trust (defined above as Lone Star) is a trust established under the laws of the state of Texas for the benefit of Michael Blend.  Upon information and belief, Defendant Stanley Blend is the trustee of the Lone Star Friends Trust and resides in San Antonio, Texas.

**Answer:** Defendants admit that Lone Star was established for the benefit of Michael Blend and his family. Defendants otherwise admit the allegations in Paragraph 22.

23.     CEE Holdings Trust (defined above as CEE) is a trust established under the laws of the state of Wyoming for the benefit Charles Ursini.  Upon information and belief, Defendant Jackson Hole Trust Company is the trustee of the CEE Holdings Trust and maintains a principal place of business in Jackson Hole, Wyoming.

**Answer:** Defendants admit that CEE was established for the benefit of Charles Ursini and his family. Defendants otherwise admit the allegations in Paragraph 23.

24.    Non-party System1, Inc., the ultimate parent company of Borrower and affiliated entities, is a Delaware corporation that, upon information and belief, maintains its principal place of business in Los Angeles, California.

**Answer:** Defendants admit the allegations in Paragraph 24.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA") because there is minimal diversity, the proposed class consists of at least 100 members, and the aggregated amount in controversy exceeds $5,000,000.  *See* 28 U.S.C. § 1332(d)(2), (5)(B), (6).

**Answer:** The allegations contained in Paragraph 25 of the Amended Complaint constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that this Court has jurisdiction over this action based on the Class Action Fairness Act.

26.    This Court has personal jurisdiction over Defendants under CPLR § 301 and Fed. Civ. P. 4(k)(1)(A) because Defendants transact business in New York state and Defendants have consented to this Court's jurisdiction.

**Answer:** The allegations contained in Paragraph 26 of the Amended Complaint constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that they transact business in New York state.

27.    This Court also has personal jurisdiction over Defendants under Section 5-1402 of the New York General Obligations Law and Fed. R. Civ. P. 4(k)(1)(A) because this action arises out of one or more contracts that (i) contain a clause in which the parties have submitted to

jurisdiction in the Southern District of New York (Credit Agreement § 11.16(b)), and (ii) contain a clause choosing New York as the governing law (*id.* § 11.16(a)).

**Answer:** The allegations contained in Paragraph 27 of the Amended Complaint constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that the Credit Agreement referenced in Paragraph 27 contains § 11.16(b) and § 11.16(a), and respectfully refer the Court to those provisions for a complete and accurate description of their contents.

28. Venue is proper in this District because the contracts governing this dispute provide for venue in the Southern District of New York and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. *See* Credit Agreement § 11.16(b).

**Answer:** The allegations contained in Paragraph 28 of the Amended Complaint constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants admit that the Credit Agreement referenced in Paragraph 28 contains § 11.16(b), and respectfully refer the Court to that provision for a complete and accurate description of its contents.

## FACTS

### I.    System1's Historical Business.

29. System1 was founded in 2013 by co-founders Blend and Ursini. It went public via SPAC merger in January 2022.

**Answer:** Defendants admit the allegations in Paragraph 29.

30. Historically, System1 operated two primary business segments. *First*, System1 provides advertising services through a proprietary platform known as the Responsive Acquisition Marketing Platform ("RAMP"). RAMP delivers valuable "high-intent" customers (*i.e.*, customers

who know what they want to buy and are likely to do so) to advertisers, as well as to System1 itself.  Specifically, RAMP utilizes machine learning to identify such high-intent customers and (i) advertise third-party products to them, and/or (ii) direct them to the 40+ websites System1 owns and operates, including MapQuest, Coupon Follow, HowStuffWorks, Info.com, and Startpage.com (such websites, the "Owned and Operated Business").  As part of its Owned and Operated Business, System1 also pays to acquire user traffic from other marketing channels (*e.g.*, Google) to its websites, where System1 then uses its RAMP marketing platform to qualify and identify high-intent users and sell the high-intent user traffic to advertisers.

**Answer:** Defendants admit that historically, System1 operated two primary business segments, one of which provided advertising services through a proprietary platform known as the Responsive Acquisition Marketing Platform, which used machine-learning to identify  and acquire "high-intent" customers and advertise third-party products to them or direct them to System1's websites that were part of its Owned and Operated Business, which included the websites listed in the third sentence of Paragraph 30. Defendants also admit that System1 used its RAMP platform to identify and acquire high-intent users from other marketing channels to its websites, where System1 then used its RAMP platform to connect that traffic to advertisers. Defendants otherwise deny the allegations in Paragraph 30.

31.    Over the past several years, the majority of System1's RAMP-driven revenue has been attributable to System1's commercial relationship with Google.

**Answer:** Defendants admit the allegations in Paragraph 31.

32.    *Second*, prior to November 2023, System1 provided antivirus software solutions to customers via a yearly subscription through Total Security Limited f/k/a Protected.net Group Limited (together with its wholly-owned subsidiaries, "Total Security").

**Answer:** Defendants deny the allegations in Paragraph 32.

## II.    **The November 2023 Transaction.**

33.    System1's financial performance began to materially deteriorate in late 2022 as its advertising services business line faced significant market headwinds.  By the third quarter of 2023, System1 was in significant distress.  Adjusted EBITDA from continuing operations (excluding Total Security) declined from $69.2 million in 2022 to $29.2 million in 2023, while net leverage ballooned from 3.0x in 2022 to 9.2x over the same timeframe.  System1's share price fell nearly 80% from December 31, 2021 to December 31 2023, and by nearly 92% from the peak in April 2022 to December 31, 2023.  The share price has subsequently fallen further and is now trading almost 96% below its April 2022 peak.

**Answer:** Defendants admit System1's share price declined in certain intervals of 2022 and 2023. Defendants otherwise deny the allegations in Paragraph 33.

34.    On March 16, 2023, System1 announced in an 8-K filing that it would be delayed in filing its 2022 10-K so that it could complete an "evaluation and quantification of identified accounting errors in historical 2022 quarterly reporting periods."

**Answer:** Defendants admit that System1 filed an 8-K on March 16, 2023. Defendants assert that the 8-K referenced in Paragraph 34 speaks for itself, and respectfully refer the Court to the 8-K for a complete and accurate description of its contents.

35.    On June 5, 2023, System1 announced in its delayed 2022 10-K filing that it had material weaknesses in its internal controls.  According to the Public Company Accounting Board, such a material weakness is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."  In this 10-K, System1 disclosed that:

(i)    "We did not design and maintain effective controls to timely analyze and record the financial statement effects from acquisitions.  Specifically, we did not design and

maintain effective controls over the (i) application of U.S. GAAP to such transactions.“

(ii)    “We did not design and maintain effective controls relating to the oversight and ongoing recording of the financial statement results of the acquired businesses.”

(iii)   “We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over (i) the preparation and review of business performance reviews, account reconciliations and journal entries, and (ii) maintaining appropriate segregation of duties.”

(iv)   “We did not design and maintain controls over the classification and presentation of accounts and disclosures in the consolidated financial statements, including the statement of cash flows.”

(v)    “We did not design and maintain effective controls over the completeness and accuracy of accrued liabilities, stock based compensation and equity transactions.”

(vi)   “We did not design and maintain effective controls over the accuracy and valuation of goodwill, including the allocation of goodwill to reporting units and the identification and measurement of goodwill impairment.”

(vii)  “We did not design and maintain effective controls over information technology (“IT”) general controls for information systems that are relevant to the preparation of our financial statements.”

**Answer:** Defendants admit that System1 filed a 10-K in June 2023, but assert that the 10-K referenced in Paragraph 35 speaks for itself, and respectfully refer the Court to the 10-K for a complete and accurate description of its contents. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 35 and on that basis deny the remaining allegations in Paragraph 35.

36.    As a result of these material weaknesses, System1 announced in June 2023 that it would have to restate its 2022 financial statements.  In the aftermath of these troubling disclosures, by June 2023 (five months before the November 2023 Transaction) the Term Loan was trading well below par at around 74 cents on the dollar, which indicated that the Borrower was insolvent.

**Answer:** Defendants admit that System1 restated its 2022 financial statements and that System1 announced the restatement in June 2023. Defendants assert that the announcement

referenced in Paragraph 36 speaks for itself, and respectfully refer the Court to the announcement for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 36.

37.     At the time of these disclosures, Blend and Ursini held large portions of System1's stock.  Blend currently owns 35,000 shares of System1 Class A common stock, in addition to another 11,558,471 shares held by Blend's father, in his capacity as trustee of various Trusts affiliated with the Blend family and in his individual capacity.  Ursini currently owns approximately 702,560 shares of System1 Class A common stock, in addition to another 13,592,663 shares that are held by CEE.

**Answer:** Defendants admit that Blend and Ursini held portions of System1 stock at the time of these disclosures. Defendants otherwise deny the allegations in Paragraph 37.

38.     Blend and Ursini were also unsecured lenders to System1.  On April 20, 2023, when System1 was in the midst of a liquidity crisis, the trusts established by Blend and Ursini, Lone Star and CEE, extended a $20 million loan to the Borrower via an unsecured revolving note (the "Revolving Note").  Pursuant to the Revolving Note, Lone Star and CEE each provided a $10 million commitment for an aggregate principal of $20 million under the Revolving Note to the Borrower on a several (but not joint) basis.  The Revolving Note provided for the Borrower to pay a "closing fee" in an amount equal to 12% of each lender's commitment within 180 days of the closing date of the note.

**Answer:** Defendants assert that the Revolving Note referenced in Paragraph 38 speaks for itself, and respectfully refer the Court to the Revolving Note for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 38.

39.     Moreover, immediately prior to the November 2023 Transaction on October 6, 2023, Openmail2, which is principally owned and managed by trusts established for the benefit of

Blend and Ursini, extended an unsecured $2.5 million term loan to the Borrower via a term loan note (the "<u>Term Note</u>" and, together with the Revolving Note, the "<u>Insider Debts</u>"). The Term Note provided for, among other things, payment by the Borrower of a "closing fee" equal to 10% of the principal amount of the Term Note payable within 180 days of the closing date of the note.

**<u>Answer:</u>** Defendants assert that the Term Note referenced in Paragraph 39 speaks for itself, and respectfully refer the Court to the Term Note for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 39.

40.    Because they were among System1's largest shareholders and trusts under their control were also unsecured lenders, Blend and Ursini were strongly incentivized to create value for themselves and other shareholders, even if it came at the expense of the Lenders. Indeed, management consistently emphasized their alignment with shareholders in public comments. As Blend noted on an earnings call held on November 10, 2022, "[m]anagement shares your pain, *as we own over 50% of System1 and much of our net worth is in System1's stock*. We remain highly aligned with our public shareholders." (emphasis added).

**<u>Answer:</u>** Defendants admit that Blend and Ursini are shareholders of System1. Defendants assert that the transcript of the November 10, 2022 Earnings Call referenced in the third sentence of Paragraph 40 speaks for itself, and respectfully refer the Court to the full transcript for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 40.

41.    In the November 2023 Transaction, the Borrower transferred its Total Security assets worth $400 million, which, prior to the transaction, were part of the Lenders' Collateral.[6]

---

[6]    As set forth above (*supra* ¶ 5 n.4), the Officer's Certificate dated December 8, 2023 executed by the Borrower in connection with the November 2023 Transaction indicates that the market value of the Total Security assets was approximately $400 million.

The assets were sold to the Insider Purchasers and the proceeds were placed beyond the Lenders' reach.  The transaction was executed in a series of steps:

(i)   *First*, the Borrower formed Sonic, a Delaware limited liability company, as a wholly-owned subsidiary and designated Sonic as an Unrestricted Subsidiary.[7] Assets held by Unrestricted Subsidiaries are not part of the Lenders' Collateral.

(ii)   *Second*, the Borrower contributed 49.99% of the equity interests in Total Security to Sonic.  Contemporaneously, the Borrower distributed a portion of the equity interests in Total Security up to Holdings.  This left the Borrower with approximately 38.39% of the equity of Total Security prior to the Total Security sale.

(iii)   *Third*, pursuant to a Share Purchase Agreement, dated November 30, 2023, the Unrestricted Subsidiary and the Borrower transferred the Total Security assets to the Insider Purchasers for approximately (i) $240 million in cash; (ii) the return and cancellation of approximately 29 million shares of System1's Class A common stock held by JDI and other entities and individuals affiliated with the Insider Purchasers; and (iii) certain other non-cash consideration.

(iv)   *Fourth*, the $240 million in cash consideration was allocated pro rata between the Borrower and the Unrestricted Subsidiary based on their respective equity interests in Total Security.

**Answer:** Defendants assert that the Officer's Certificate referenced in Footnote 6 speaks for itself, and respectfully refer the Court to the Officer's Certificate for a complete and accurate description of its contents. Defendants likewise assert that the Credit Agreement referenced in Footnote 7 speaks for itself, and respectfully refer the Court to the Credit Agreement for a complete and accurate description of its contents. Defendants admit that the November 2023 transaction included the steps outlined in subsections (i)-(iv), but deny that those steps are a comprehensive

---

[7]   Under the Credit Agreement, "Unrestricted Subsidiary" means "(a) each Subsidiary of the Borrower listed on Schedule 1.01A and (b) any Subsidiary of the Borrower designated by a Responsible Officer of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.15 subsequent to the Closing Date (and continuing until such time that such designation may be thereafter revoked by the Borrower) and (c) any Subsidiary of any Person described in the foregoing clauses (a) and/or (b)." It is worth noting that, when the Borrower entered into the Credit Agreement, there were no subsidiaries designated as Unrestricted Subsidiaries pursuant to Schedule 1.01A of the Credit Agreement.

representation of the November 2023 transaction, and otherwise deny the allegations in Paragraph 41.

42.     These steps are depicted in the following graphic with the numbers corresponding to the steps of the transaction described above:

### November 2023 Transaction – Disposition of Total Security



**Answer:** Defendants deny the allegations in Paragraph 42.

43.     The Borrower used a portion of the proceeds of the Total Security sale to make the following payments:

    a.  $20 million in satisfaction of the Revolving Note issued by Lone Star and CEE, including the 12% "closing fee" on the principal amount;

    b.  $2.5 million in satisfaction of the Term Note issued by Defendant Openmail2, including the 10% "closing fee" on the principal amount; and

    c.  $10 million in satisfaction of a term loan provided by a subsidiary of JDI that was issued on October 6, 2023, including a 12% "closing fee" on the principal amount.[8]

---

[8]     On October 6, 2023, Total Security entered into a Secured Facility Agreement (the "Facility Agreement") providing for a $10.0 million term loan with Onyx Asset Finance Limited, a company organized under the laws of England & Wales and a subsidiary of JDI.  Total Security entered into the Facility Agreement less than a month after publicly confirming receipt of the indication of interest from JDI in an 8-K filing.

**Answer:** Defendants admit that the Borrower used a portion of the proceeds of the Total Security sale to make payments in the amounts listed. Defendants further admit that Total Security entered into the Facility Agreement on October 6, 2023, providing for a $10.0 million term loan with Onyx Asset Finance Limited, a company organized under the laws of England & Wales and a subsidiary of JDI. Defendants otherwise deny the allegations in Paragraph 43 and Footnote 8.

44.    System1 also utilized a portion of the proceeds of the Total Security sale to repurchase $64.9 million in principal amount of the Term Loan for an aggregate purchase price of $41.6 million, 64.12% of its par value (such repurchase, the "Term Loan Repurchase").

**Answer:** Defendants admit the allegations in Paragraph 44.

45.    The November 2023 Transaction removed critical and valuable assets from the Collateral securing Plaintiffs' Term Loan.  As a result, the market value of the Term Loan fell from 65 to 55 cents on the dollar by mid-December 2023, before falling further to 50 cents on the dollar by 2025.  Notably, while the market value of the secured debt fell between November and December 2023, System1's stock price jumped from approximately $13 per share immediately prior to the November 2023 Transaction to $28 per share in December 2023, before falling again in early 2024.

**Answer:** Defendants admit that System1's stock price increased from approximately $13 per share in November 2023 to approximately $28 per share in December 2023, and subsequently decreased in 2024. Defendants otherwise deny the allegations in Paragraph 45.

46.    The Borrower was insolvent at the time of the November 2023 Transaction or was rendered insolvent thereby.  After the November 2023 Transaction, the value of the Borrower's liabilities exceeded its assets by approximately $194 million.  At that time, the Borrower's total liabilities were approximately $361 million, while its enterprise value was, at most, only approximately $167 million.  This enterprise value is calculated by using the Borrower's projected

2023 Adjusted EBITDA, approximately $27.9 million, and a multiple of six based on the Borrower's lagging financial performance relative to its peer group.  This enterprise value demonstrates the November 2023 Transaction rendered the Borrower insolvent.[9]

**Answer:** Defendants admit that, after the November 2023 transaction, the Borrower's total liabilities were approximately $361 million. Defendants assert that the transcript of the December 12, 2023 Earnings Call referenced in Footnote 9 speaks for itself, and respectfully refer the Court to the full transcript for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 46 and Footnote 9.

47.    The market's reaction to the November 2023 Transaction also strongly suggests that the transaction rendered the Borrower insolvent and inadequately capitalized.  On January 19, 2024, S&P Global Ratings ("S&P") issued a report downgrading the Term Loan's rating from "CCC" to "D" on the basis of the Term Loan Repurchase, which S&P described as "distressed and tantamount to a default."  The S&P Report explained that S&P's analysts:

> view[ed] the transaction as distressed because lenders received substantially less than originally promised, and we also viewed the company's capital structure as unsustainable and subject to default risk prior to the sale of its Total Security business and the subsequent debt repayment.  This was due to the company's elevated leverage and our expectations for negative free operating cash flow over the next 12 months with limited visibility into a recovery in performance given the ongoing advertising recession.

**Answer:** Defendants admit that S&P Global Ratings (S&P) issued a ratings update report discussing the Term Loan. Defendants respectfully refer the Court to the report for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 47.

---

[9] The Borrower's projected 2023 Adjusted EBITDA of $27.9 million was calculated based on the sum of $8.5 million, which was the midpoint of management guidance for the fourth quarter of 2023 (announced on December 12, 2023 earnings call) and actual reported Adjusted EBITDA from continuing operations of $19.37 million for the first three quarters of 2023.

48.     System1's contemporaneous statements also confirm the Borrower's insolvency. In January of 2024—just two months after the November 2023 Transaction closed—management conceded that System1's "anticipated 2024 EBITDA and free cash flow [would be] insufficient to service its term loan debt."  By System1's admission, the Borrower had inadequate capital for its operations.  The Borrower's insolvency was further evidenced by the fact that its *secured* debt was trading at a significant discount to par both before and after the transaction, indicating that the markets recognized that the fair market value of the Borrower's assets was less than the total amount of its liabilities.

**Answer:** Defendants admit that the quotation in the second sentence derives from a presentation prepared by System1 in January 2024. Defendants assert that the presentation speaks for itself, and respectfully refer the Court to that provision within the full presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 48.

### III.    The August 2024 Transaction Strips Additional Assets From the Lenders' Collateral for the Benefit of Shareholders.

49.     System1's insiders determined to remove additional assets from the Lenders' Collateral in August 2024.  This transaction was likewise conceived to enhance the value of their equity interests at the expense of the Lenders.  The August 2024 Transaction removed additional assets—a segment of the Company's Owned and Operated Business (the "Products Business")— from the Collateral package securing the Term Loan.  Blend boasted to investors in August 2025 that the very assets that were stripped from Lenders in connection with this "corporate reorganization" were worth more than the publicly traded enterprise value of all of System1.

**Answer:** Defendants assert that the transcript of the August 7, 2025 Earnings Call referenced in the fourth sentence of Paragraph 49 speaks for itself and respectfully refer the Court

to the full transcript for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 49.

50.    The August 2024 Transaction unfolded in four steps:

(i)    *First*, the Borrower designated each of Privacy One Group Limited ("<u>Privacy</u>"), NextGen Shopping LLC ("<u>NextGen</u>"), Mapquest Holdings, LLC ("<u>MQH</u>"), and Mapquest Services Holdings ("MQSH"), which collectively owned the Products Business, as Unrestricted Subsidiaries.

(ii)    *Second*, Privacy, NextGen, MQH, and MQSH transferred the Products Business down to their newly created subsidiaries, New Privacy One Group Inc. ("<u>New Privacy</u>"), New NextGen, LLC ("<u>New NextGen</u>"), New MQH, LLC ("<u>New MQH</u>"), and New MQSH, LLC ("<u>New MQSH</u>").

(iii)    *Third*, New Privacy, New NextGen, New MQH, and New MQSH transferred the Products Business up to the Borrower through System1 OpCo, LLC ("<u>OpCo</u>") and System1 S1, Inc. ("<u>S1</u>").

(iv)    *Fourth*, the Borrower transferred the Products Business through Holdings to a newly created parent entity of Holdings, System1 Holdings, LLC ("<u>New Holdco</u>").

(v)    New Holdco transferred the Products Business down to a newly created entity, S1 Media, which is not a Loan Party (as such term is defined in the Credit Agreement).

**Answer:** Defendants admit that the August 2024 transaction included the steps outlined in subsections (i), (ii), and (v) in Paragraph 50, but deny that those steps are a comprehensive representation of the August 2024 transaction, and otherwise deny the allegations in Paragraph 50.

51.    These steps are depicted in the following graphic with the numbers corresponding to the steps described above:





**Answer:** Defendants deny the allegations in Paragraph 51.

52.     In summary, the August 2024 Transactions transferred assets, which Blend conceded were worth more than the entire enterprise value of System1, from the Lenders' Collateral and channeled them into a newly created entity, S1 Media, which was not a Loan Party. This transaction effectively placed these assets beyond the reach of the Lenders.  Because these assets are owned by an intermediate holding company that owns the Borrower, they are now owned solely for the benefit of System1's shareholders.

**Answer**: Defendants admit that the August 2024 transaction shifted assets under a newly created entity, S1 Media, which was outside of the lenders' Collateral.  Defendants assert that the transcript of the August 7, 2025 Earnings Call referenced in Paragraph 52 speaks for itself, and respectfully refer the court to the full transcript for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 52.

53.     There was no plausible business purpose for the August 2024 Transaction other than to transfer assets out of Plaintiffs' Collateral to enrich System1's insiders and shareholders.

Indeed, in its most recent 10-K filing with the SEC, System1 described the August 2024 Transaction simply as a "corporate reorganization," without any explanation of the underlying purposes or benefits of such reorganization.  The same 10-K filing also notes that:

> [f]ollowing the corporate reorganization, (a) System1 Holdings now owns 100% of [Holdings], the previous intermediate holding company with the non-controlling interests, and 100% of S1 Media, LLC ("S1 Media"), another new subsidiary formed in connection with the corporate reorganization, (b) S1 Media holds the assets and business operations associated with our owned and operated products businesses, which include NextGen Shopping, Inc.  [], Startpage and Mapquest, and (c) [Holdings] holds our remaining assets and business operations associated with our digital advertising businesses, including our proprietary RAMP platform. [Holdings] and its subsidiaries remain obligors and guarantors under our Term Loan and 2022 Revolving Facility, **and System1 Holdings and S1 Media are not parties thereto**.

(emphasis added).

**Answer:** Defendants assert that the 10-K referenced in Paragraph 53 speaks for itself, and respectfully refer the Court to the 10-K for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 53.

54.    In public statements since the August 2024 Transaction, System1's management has continued to highlight that the transaction stripped assets from the Lenders' Collateral.  In an earnings call held on August 7, 2025, Blend emphasized to investors first, that "[o]n a standalone basis—and this is important—we believe our combined product businesses are worth significantly more than the current enterprise value of the entire company," and immediately thereafter noted that "*as a result of a corporate reorganization we did last summer, our products business segment is not collateral securing our credit agreement*." (emphasis added).  Blend also opined that "we think that the market does not appreciate the true value of our product segment, particularly when you understand our overall corporate and capital structure."

**Answer:** Defendants assert that the transcript of the August 7, 2025 Earnings Call referenced in Paragraph 54 speaks for itself, and respectfully refer the court to the full transcript

for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 54.

55.     Indeed, it is unsurprising that the intent of the August 2024 Transaction was to transfer the Products Business away from the Lenders for the benefit of System1's shareholders, given that this business has been a stable driver of revenue, while the partner network business—which comprises the Lenders' remaining Collateral owned by the Borrower—has been significantly volatile as a result of that segment's dependence upon various external factors, including Google's business practices.  As Blend noted in a March 10, 2025 earnings call, System1's positive results in the fourth quarter of 2024 "were primarily driven by our Owned & Operated products." Blend further noted that, "[i]n contrast, our marketing-driven businesses *continue to be negatively affected by fluctuations in our Google-related business*," and that the partner network business owned by the Borrower "*continue[s] to see ongoing volatility due to changes enacted by Google in their search Partner Netw*ork." (emphasis added).  Thus, the August 2024 Transaction not only stripped valuable assets from the Lenders but also left the Lenders with Collateral that was deteriorating in value.

**Answer:** Defendants assert that the transcript of the March 10, 2025 Earnings Call referenced in Paragraph 55 speaks for itself, and respectfully refer the court to the full transcript for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 55.

56.     The Borrower continued to be insolvent when it entered into the August 2024 Transaction.  After the August 2024 Transaction, the value of the Borrower's liabilities exceeded its assets by at least $50 million (and likely much more).  The Borrower's total liabilities were approximately $296 million, while its enterprise value was, at most, only approximately $244 million.  This enterprise value is calculated by using the Borrower's projected 2024 EBITDA, $37

million, and a multiple of 6.5 based on the Borrower's lagging financial performance relative to its peer group.

**Answer:** Defendants admit that, after the August 2024 transaction, the Borrower's total liabilities were approximately $296 million. Defendants otherwise deny the allegations in Paragraph 56.

57.    Moreover, System1's own base-case projections provided to the Lenders show that the Borrower would utilize nearly 70% of the Revolver and would not generate sufficient net cash flow to satisfy its Term Loan maturity payment in 2027. And System1's management conceded in January of 2024 that it would likely be unable to pay its debts during 2024.

**Answer:** Defendants admit that System1 provided projections to the lenders, but assert that the projections speak for themselves and respectfully refer the Court to the projections for a complete and accurate description of their contents. Defendants assert that the presentation referenced in Paragraph 57 speaks for itself, and respectfully refer the Court to the presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 57.

58.    The Borrower's actual intent to hinder and delay repayment of the Term Loan and defraud the Lenders through the November 2023 Transaction and the August 2024 Transaction is exemplified by multiple badges of fraud, including that: (i) there was no business purpose for the transfer of assets to Unrestricted Subsidiary Sonic and to Holdings other than to remove the assets from Plaintiffs' Collateral and avoid having to prepay the Term Loan, (ii) the Borrower was insolvent at the time of both transfers, (iii) the transfers included transfers made to insiders, including asset transfers to Holdings and repayments of unsecured and subordinated debts owed by System1 to trusts in which Blend, Ursini and their relatives were beneficiaries, (iv) the transfers were made to improve the position of the insiders, Blend and Ursini because they had substantial

equity holdings which benefited from the transactions, and (v) the Borrower received less than reasonably equivalent value for the transfers to Holdings, Sonic, and the Insider Purchasers in connection with the November 2023 Transaction and *no* consideration for the transfer of the Products Business up the corporate chain in the August 2024 Transaction.  The actual intent to defraud is also evidenced by the Borrower's lack of transparency with the Lenders.  System1 has provided only a limited amount of information about the transactions and has refused to allow Plaintiffs to examine a purported solvency opinion that System1 obtained from Stout Risius Ross, LLC in connection with the August 2024 Transaction.

**Answer:**  The allegations contained in Paragraph 58 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 58.

59.    System1's management has demonstrated that it is neither a responsible nor reliable steward of the business.  Its 2024 10-K disclosed that the material weaknesses in internal controls first disclosed in its 2022 10-K (*supra* ¶ 31) *had continued at least through 2024*.  Notably, System1 disclosed that it "did not design and maintain effective controls to timely analyze and record the financial statement effects from complex, non-routine transactions, including acquisitions [and] dispositions," which raises serious doubts concerning System1's ability to accurately account for the November 2023 and August 2024 Transactions.  System1 also disclosed that:

(i)    "We did not design and maintain an effective control environment commensurate with our financial reporting requirements.  Specifically, we lacked a sufficient number of professionals with an appropriate level of accounting knowledge, training and experience to appropriately analyze, record and disclose accounting matters timely and accurately."

(ii)    "We did not design and maintain effective controls in response to the risks of material misstatement.  Specifically, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting."

(iii)    "We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over (i) the preparation and review of business performance reviews, account reconciliations journal entries, and identification of asset groups and (ii) maintaining appropriate segregation of duties.  Additionally, we did not design and maintain controls over the classification and presentation of accounts and disclosures in the consolidated financial statements, including the statement of cash flows."

**Answer:** Defendants assert that the 10-K referenced in Paragraph 59 speaks for itself, and respectfully refer the Court to the 10-K for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 59.

## IV.    The August 2024 Transaction Breached the Credit Agreement.

### A.  The August 2024 Transaction Breached Section 7.10 of the Credit Agreement.

60.    Section 7.10 provides that Holdings, a subsidiary of System1, Inc.  and an intermediate holding company that owns the Borrower, "shall not…convey, sell or otherwise Dispose of substantially all of its assets to another Person" (other than the Borrower and any of its Subsidiaries) <u>unless</u>, among other things, that entity "expressly assumes all of the Obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party."  The Credit Agreement defines "Dispose" broadly to include any "sale, transfer, license, lease or other disposition (whether effected pursuant to a division or otherwise) of any property to any Person." Credit Agreement § 1.01.It also defines "Person" broadly to include "any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity." *Id.*  Put simply, Section 7.10 bars Holdings from transferring substantially all of its assets to an entity other than the Borrower and its Subsidiaries unless that entity assumes Holdings' obligations under the Credit Agreement.

**Answer:** Defendants admit that the Credit Agreement referenced in Paragraph 60 contains Section 7.10 and § 1.01, and respectfully refer the Court to those provisions for a complete and accurate description of their contents. Defendants otherwise deny the allegations in Paragraph 60.

61.     In connection with the August 2024 Transaction, Holdings transferred assets with purported fair market value of $112 million (as estimated by System1) up the corporate chain to New Holdco, which subsequently transferred the assets to its newly created subsidiary, S1 Media. Neither New Holdco nor S1 Media are Subsidiaries of the Borrower.[10]  Nor did they assume Holdings' obligations under the Credit Agreement.  By System1's admission, the assets transferred constituted "substantially all" of Holdings' assets: in an August 7, 2025 earnings call Blend boasted that the transferred assets were worth more than the publicly traded enterprise value of the ***entire company*** (*supra* ¶ 48).

**Answer:** Defendants admit that neither New Holdco nor S1 Media are subsidiaries of the Borrower, and that they did not assume Holdings' obligations under the Credit Agreement. Defendants assert that the transcript of the August 7, 2025 Earnings Call referenced in the fourth sentence and in Footnote 10 speaks for itself, and respectfully refer the court to the full transcript for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 61 and Footnote 10.

62.     Holdings, therefore, breached Section 7.10 by transferring substantially all of its assets to an entity other than the Borrower and its Subsidiaries that did not assume Holdings' obligations under the Credit Agreement.

---

[10]    The assets were in fact worth significantly more than $112 million.  Indeed, Blend boasted that the assets were worth more than the entire enterprise value of System1.

**Answer:** The allegations contained in Paragraph 62 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 62.

### B. The August 2024 Transaction Breached Sections 7.02(r) and 7.06(g) of the Credit Agreement.

63.    As explained above, the first step of the August 2024 Transaction was to designate certain existing Subsidiaries as Unrestricted Subsidiaries.  Section 6.15 of the Credit Agreement provides that the "designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the applicable Restricted Companies therein at the date of designation in an amount equal to the net book value …of the Restricted Companies' Investments therein." Section 7.02 of the Credit Agreement, in turn, restricts the Borrower's ability to make "Investments."[11] Specifically, Section 7.02 provides that "the Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to…make or hold any Investments" other than certain narrow, enumerated exceptions (referred to by market convention as "baskets").

**Answer:** Defendants admit that the August 2024 transaction involved designating certain existing subsidiaries as Unrestricted Subsidiaries. Defendants admit that the Credit Agreement referenced in Paragraph 63 contains Sections 6.15 and 7.02, and respectfully refer the Court to those provisions for a complete and accurate description of their contents. Defendants likewise

---

[11]    Under the Credit Agreement, an "Investment" means, "as to any Person (a) the purchase or other acquisition for consideration of Equity Interests or debt or other securities of another Person, (b) a loan, advance (in each case, other than any advance to any current or former employee, officer, director, member of management, manager, consultant or independent contractor of the Borrower, any Restricted Subsidiary, or any Parent Company for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution to, or Guarantee of Indebtedness of, another Person, in each case, in exchange for consideration or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person."

respectfully refer the Court to the Credit Agreement for the definition of "Investment" referenced in Footnote 11. Defendants otherwise deny the allegations in Paragraph 63.

64.    In the August 2024 Transaction, System1 relied on the basket in Section 7.02(r), which permits Investments up to the "Available Amount." As relevant here, Available Amount "means, at any time, an amount equal to:"

(i)    if positive, an amount equal to the CNI Growth Amount, (provided, that no amount shall be available under this clause…unless the Borrower would be permitted to incur at least $1 under Section 7.03(z); plus

(ii)    100% of the aggregate amount of contributions to the common capital of the Borrower or the net proceeds of the issuance of Qualified Equity Interests of Holdings (or any direct or indirect parent thereof) contributed to the Borrower to the extent Not Otherwise Applied, in each case, received in cash during the period from and including the Business Day immediately following the Closing Date through and including such time; plus

(iii)    an amount equal to the sum of (A) in the event any Unrestricted Subsidiary has been redesignated as a Restricted Subsidiary pursuant to Section 6.15 or has been merged, consolidated or amalgamated with or into, or is liquidated into, the Borrower or any Restricted Subsidiary, the amount of the Investments of the Borrower or any Restricted Subsidiary in such Subsidiary made pursuant to Section 7.02(r)(i) (in an amount not to exceed the original amount of such investment) and (B) the fair market value (as reasonably determined by the Borrower) of the property of any Unrestricted Subsidiary that have been transferred, conveyed, or otherwise distributed to the Borrower or any Restricted Subsidiary after the Closing Date from any dividend or other distribution by an Unrestricted Subsidiary.

Credit Agreement § 1.01.

**Answer:** The allegations contained in Paragraph 64 constitutes legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants assert that the Credit Agreement, which contains the definition for the term "Available Amount" referenced in Paragraph 64, speaks for itself, and respectfully refer the Court to the Credit Agreement's definition of "Available Amount" for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 64.

65.    System1 claimed that, immediately prior to the Specified Designations, the Available Amount was equal to approximately $215 million consisting of (i) approximately $120

million of CNI Growth Amount, (ii) approximately $29 million of contributions to the common capital of the Borrower resulting from the acquisition of NextGen Shopping, LLC in March 2022, and (iii) approximately $66 million from Sonic's distribution of the Total System sale proceeds to the Borrower.  These amounts were intentionally and artificially inflated to enable the Borrower to claim that it was permissible to strip the Lenders of their Collateral.  Because these claimed valuations were not correct, the Borrower's transfers were in breach of Section 7.02(r) of the Credit Agreement.[12]

**Answer:** Defendants admit that the dollar values represented in the first sentence of Paragraph 65 derive from a letter that System1 delivered to Bank of America, N.A. on October 21, 2024. Defendants assert that the letter speaks for itself, and respectfully refer the court to the letter for a complete and accurate description of its contents.  The allegations contained in the second and third sentences of Paragraph 65 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the second and third sentences.

Defendants deny that the Available Amount referenced in Footnote 12 was inflated by System1, and deny that ¶¶ 44-45 represent the August 2024 transaction, but otherwise admit the allegations in the first sentence of Footnote 12. The allegation contained in the second sentence of Footnote 12 constitutes a legal contention and/or conclusion to which no response is required. To the extent a response is required, Defendants deny that System1 breached the Credit Agreement,

---

[12]   System1 also used the inflated Available Amount to distribute, pursuant to Section 7.06(g) of the Credit Agreement, the Borrower's equity interests in the Owned and Operated Business up the corporate chain through Holdings to a newly created parent entity of Holdings, New Holdco (Step 4 of the August 2024 Transaction, described above (*supra* ¶¶ 44-45)).  In so doing, System1 also breached Section 7.06(g) of the Credit Agreement, which permits Restricted Payments (including dividends) up to the Available Amount.

and respectfully refer the Court to the Credit Agreement for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 65 and Footnote 12.

66.     *First*, the Borrower was not entitled to use any portion of the alleged CNI Growth Amount.  By its terms, the CNI Growth Amount is available only if the Borrower "would be permitted to incur at least $1 under Section 7.03(z)." Credit Agreement § 1.01.  Pursuant to Section 7.03(z), the Borrower can incur (i) first lien debt only if its First Lien Leverage Ratio does not exceed 2.95:1.00, (ii) junior secured debt only if its Secured Leverage Ratio does not exceed 3.70:1.00, and (iii) unsecured debt only if its Total Leverage Ratio does not exceed 3.95:1.00.[13]

**Answer:**  The allegations contained in Paragraph 66 constitute legal contentions and/or conclusions to which no response is required.  To the extent a response is required, Defendants admit that the Credit Agreement referenced in Paragraph 66 and in Footnote 13 contains § 1.01 and Section 7.03(z), and respectfully refer the Court to those provisions for a complete and accurate description of their contents, but otherwise deny the allegations in Paragraph 66.

67.     In computing its leverage ratios to justify using the CNI Growth Amount, the Borrower improperly inflated its EBITDA.  For the last twelve months ended June 30, 2024 (the last full quarter before the August 2024 Transaction closed), the System1 publicly reported Adjusted EBITDA of $28.5 million for the Borrower.  By contrast, the compliance certificate

---

[13]    Under the Credit Agreement,

"First Lien Leverage Ratio" means "as of any date of determination, the ratio of (a) Consolidated Total Debt that is First Lien Debt to (b) Consolidated EBITDA as of the last day of the most recently ended Test Period, in each case, of the Borrower and its Restricted Subsidiaries on a consolidated basis."

"Secured Leverage Ratio" means "as of any date of determination, the ratio of (a) Consolidated Total Debt that is secured to (b) Consolidated EBITDA as of the last day of the most recently ended Test Period, in each case, of the Borrower and its Restricted Subsidiaries on a consolidated basis."

"Total Leverage Ratio" means "as of the date of determination, the ratio of (a) Consolidated Total Debt that is outstanding on such date of determination (b) Consolidated EBITDA as of the last day of the most recently ended Test Period, in each case, of the Borrower and its Restricted Subsidiaries on a consolidated basis."

delivered to the Administrative Agent under the Credit Agreement (the "Compliance Certificate") represented that the Borrower had EBITDA of $96.6 million for the same time period. The difference is due largely to a supposed $66.6 million distribution the Borrower received from its Unrestricted Subsidiary, Sonic, consisting of proceeds from the Total Security sale. But System1 has historically consolidated its financials, including those of its subsidiary Sonic, in its public filings. The supposed distribution had no impact on the Company's consolidated balance sheet cash or its earnings. Furthermore, the majority of the $66.6 million distribution was used to repurchase $64.9 million of the Term Loan at a 36% discount to par. That distribution was designed to inflate EBITDA to enable the Borrower to claim that the transfer was permitted.

**Answer:** Defendants admit that System1 publicly reported an Adjusted EBIDTA amount of $28.5 million for the Borrower. Defendants further admit that System1 has historically consolidated its financials. Defendants otherwise deny the allegations in Paragraph 67.

68.    Using System1's reported Adjusted EBITDA of $28.5 million for the Borrower, the First Lien Leverage Ratio (the most lenient of the three tests), was 9.25x, more than three times higher than permitted under Section 7.03(z). Without the Borrower improperly inflating EBITDA, the Borrower could not include the CNI Growth Amount in the Available Amount. By including the CNI Growth Amount in the Available amount, the Borrower breached Sections 7.02(r) and 7.06(g) of the Credit Agreement when it entered into the August 2024 Transaction.

**Answer:** The allegations contained in Paragraph 68 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 68.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Against Orchid Merger Sub II, LLC and S1 Holdco, LLC)

69.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

70.     The Credit Agreement is a valid and enforceable agreement.

**Answer:** Defendants admit the allegations in Paragraph 70.

71.     Plaintiffs are parties to the Credit Agreement.

**Answer:** Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 71, and on that basis deny the allegations in Paragraph 71.

72.     The Borrower and Holdings are parties to the Credit Agreement.

**Answer:** Defendants admit the allegations in Paragraph 72.

73.     Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

**Answer:** Defendants deny the allegations in Paragraph 73.

74.     Section 7.10 of the Credit Agreement provides that: Holdings "shall not…convey, sell or otherwise Dispose of substantially all of its assets to another Person" (other than the Borrower and any of its Subsidiaries) *unless*, among other things, that entity "expressly assumes all of the Obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party."

**Answer:** Paragraph 74 contains legal contentions and/or conclusions to which no response is required.  To the extent a response is required, Defendants admit that the Credit Agreement

referenced in Paragraph 74 contains Section 7.10 and respectfully refer the Court to that provision for a complete and accurate description of its contents.

75.     Holdings breached Section 7.10 of the Credit Agreement by transferring substantially all of its assets to New Holdco, which subsequently transferred the assets to its newly created subsidiary, S1 Media, an entity other than the Borrower and its Subsidiaries.

**Answer:** Defendants deny the allegations in Paragraph 75

76.     Neither New Holdco nor S1 Media assumed Holdings' obligations under the Credit Agreement following this transfer.

**Answer:** Defendants admit the allegation in Paragraph 76.

77.     Section 7.02(r) permits Investments up to the "Available Amount."

**Answer:** Paragraph 77 contains legal contentions and/or conclusions to which no response is required.  To the extent a response is required, Defendants admit that the Credit Agreement referenced in Paragraph 77 contains Section 7.02(r) and respectfully refer the Court to that provision for a complete and accurate description of its contents.

78.     Section 7.06(g) of the Credit Agreement permits Restricted Payments up to the "Available Amount."

**Answer:** Paragraph 78 contains legal contentions and/or conclusions to which no response is required.  To the extent a response is required, Defendants admit that the Credit Agreement referenced in Paragraph 78 contains Section 7.06(g) and respectfully refer the Court to that provision for a complete and accurate description of its contents.

79.     The Borrower breached Sections 7.02(r) and 7.06(g) of the Credit Agreement when it consummated the August 2024 Transaction.  The Borrower intentionally and improperly inflated the Available Amount, defined in Section 1.01 of the Credit Agreement, to make a prohibited

Investment in Unrestricted Subsidiaries pursuant to Section 7.02(r) of the Credit Agreement and a prohibited Restricted Payment up the corporate chain pursuant to 7.06(g) of the Credit Agreement.

**Answer:** Defendants deny the allegations in Paragraph 79.

80.    The prohibited distributions stripped the Lenders of their Collateral in breach of Sections 1.01, 7.02, and 7.06 of the Credit Agreement, which permits the Holdings and the Borrower to make Restricted Payments and Investments up to the Available Amount.

**Answer:** Defendants deny the allegations in Paragraph 80.

81.    Plaintiffs have suffered damages as a result of Borrower and Holdings' breaches in an amount to be proven at trial.

**Answer:** Defendants deny the allegation in Paragraph 81.

**SECOND CAUSE OF ACTION**
**Intentional Fraudulent Transfer**
**(Against Orchid Merger Sub II, LLC, S1 Holdco, LLC, and Sonic Newco, LLC)**

82.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

83.    Prior to, at the time of, and following the November 2023 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

**Answer:** The allegations contained in Paragraph 83 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 83.

84.    The November 2023 Transaction included multiple transfers of property, including: (i) the Borrower's contribution of 49.99% of the equity interests in Total Security down to Sonic;

(ii) the Borrower's dividend of a portion of the equity interests in Total Security equal to the value of the equity interests in System1, Inc.  to be surrendered by the Purchasers up to Holdings, leaving the Borrower with approximately 38.39% of the equity of Total Security prior to the Total Security sale; and (iii) all related transfers that facilitated the foregoing.  (collectively, the "Total Security Transfers").   The Borrower received no consideration in connection with either of the Total Security Transfers.

**Answer:** Defendants admit that the November 2023 transaction included multiple transfers of property, including the Borrower's contribution of 49.99% of the then outstanding equity interests in Total Security to Sonic. Defendants otherwise deny the allegations in Paragraph 84.

85.    The Total Security Transfers made by the Borrower were made with the actual intent to hinder, delay, or defraud the Borrower's creditors, including Plaintiffs.  Such intent is evident from the presence of multiple badges of fraud.

**Answer:** Defendants deny the allegations in Paragraph 85.

86.    *First*, there was no business purpose for the transfer of assets to Unrestricted Subsidiary, Sonic, and to Holdings other than to remove the assets from Plaintiffs' Collateral and avoid having to prepay the Term Loan.

**Answer:** Defendants deny the allegations in Paragraph 86.

87.    *Second*, the Borrower was insolvent at the time of the Total Security Transfers or became insolvent shortly after the Total Security Transfers as a result thereof.  Defendants knew this.  They knew that (i) System1's financial performance was deteriorating, (ii) trading levels of the Term Loans were well below par, which indicated that the Borrower was insolvent and in financial distress, and (iii) they conceded that the Borrower would not be able to meet its obligations under the Term Loan in January 2024 with the free cash flow generated by the business.

**Answer:** Defendants assert that the January 2024 presentation referenced in subsection (iii) of Paragraph 87 speaks for itself, and respectfully refer the Court to the presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 87.

88.    *Third*, the Total Security Transfers included multiple transfers to insiders, including asset transfers to Holdings and repayments of unsecured and subordinated debts owed by System1 to trusts in which Blend, Ursini and their relatives were beneficiaries.

**Answer:** Defendants deny the allegations in Paragraph 88.

89.    *Fourth*, based on their substantial equity holdings, Blend and Ursini had clear motives to transfer assets from the Lenders' Collateral to entities outside the Lenders' Collateral where they would benefit System1's shareholders to the detriment of the Lenders.

**Answer:** Defendants deny the allegations in Paragraph 89.

90.    *Fifth*, the consideration that the Borrower received from the Total Security Transfers was worth significantly less than the $400 million of assets transferred by the Borrower.

**Answer:** Defendants deny the allegations in Paragraph 90.

91.    The Total Security Transfers were made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs. The Total Security Transfers are therefore in violation of, and voidable under, Cal. Civ. Code § 3439.04(a)(1).

**Answer:** Defendants deny the allegations in Paragraph 91.

92.    Accordingly, the Total Security Transfers and any and all proceeds or products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(1), 3439.07, and 3439.08(b).

**Answer:** Defendants deny the allegations in Paragraph 92.

**THIRD CAUSE OF ACTION**
**Constructive Fraudulent Transfer**
**(Against Orchid Merger Sub II, LLC, S1 Holdco, LLC, and Sonic Newco, LLC)**

93.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

94.    Prior to, at the time of, and following the November 2023 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

**Answer:** The allegations contained in Paragraph 94 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 94.

95.    The November 2023 Transaction included multiple transfers of property, in the form of the Total Security Transfers.

**Answer:** Defendants admit that the November 2023 transaction included multiple steps to effectuate transfers of property. Defendants otherwise deny the allegations in Paragraph 95.

96.    The Total Security Transfers made by the Borrower were made by an insolvent entity without receiving reasonably equivalent value.  The Borrower contributed 49.99% of the equity in Total Security to Sonic for no consideration.  Similarly, the Borrower distributed equity in Total Security via dividend to Holdings for no consideration.

**Answer:** Defendants admit that the Borrower contributed 49.99% of the then outstanding equity interests in Total Security to Sonic. Defendants otherwise deny the allegations in Paragraph 96.

97.     The only purpose of the Total Security Transfers was to strip assets from the Borrower so as to avoid being required to use the proceeds of the Total Security sale to repay the Term Loan, and so that the Lenders' liens would not attach to the sale proceeds.

**Answer:** Defendants deny the allegations in Paragraph 97.

98.     The Borrower was insolvent on the date of the Total Security Transfers; was left with unreasonably small capital on the date of the Total Security Transfers or as a result of the Total Security Transfers; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.  Defendants knew this.  They knew that (i) the Borrower's financial performance was deteriorating, (ii) trading levels of the Term Loans were well below par, which indicated that the Borrower was in distress, and (iii) they conceded that the Borrower would not be able to meet its obligations under the Term Loan in January 2024 with the free cash flow generated by the business.

**Answer:** Defendants assert that the January 2024 presentation  referenced in subsection (iii) of  Paragraph 98 speaks for itself, and respectfully refer the Court to the presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 98.

99.     By virtue of the foregoing, the Total Security Transfers were constructive fraudulent transfers in violation of and voidable under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

**Answer:** Defendants deny the allegations in Paragraph 99.

100.    Accordingly, the Total Security Transfers and any proceeds or products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, 3439.07, and 3439.08(b).

**Answer:** Defendants deny the allegations in Paragraph 100.

**FOURTH CAUSE OF ACTION**
**Intentional Fraudulent Transfer**
**(Against Openmail2, LLC, Stanley Blend in his capacity as Trustee of
the Lone Star Friends Trust, and Jackson Hole Trust Company as
Trustee of the CEE Holdings Trust)**

101.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

102.    Prior to, at the time of, and following the November 2023 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

**Answer:** The allegations contained in Paragraph 102 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 102.

103.    In connection with the November 2023 Transaction, the Borrower transferred assets to an Unrestricted Subsidiary, Sonic, which in turn sold the assets for cash to the Insider Purchasers.  Sonic then made the following transfers (collectively, the "Insider Transfers"): (i) $20 million cash to Lone Star and CEE ($10 million to each entity) in satisfaction of the Revolving Note provided by Lone Star and CEE, (ii) a 12% "closing fee" to Lone Star and CEE on the principal amount of the Revolving Note, (iii) $2.5 million cash to Defendant Openmail2 in satisfaction of the Term Note provided by Openmail2, and (iv) a 10% "closing fee" to Openmail2 on the principal amount of Term Note.

**Answer:** Defendants admit that, pursuant to the November 2023 transaction, the Borrower transferred assets to Sonic, an Unrestricted Subsidiary. Defendants otherwise deny the allegations in Paragraph 103.

104.    The Insider Transfers made by the Borrower were made with the actual intent to hinder, delay, or defraud the Borrower's creditors, including Plaintiffs.  Such intent is evident from the presence of multiple badges of fraud.

**Answer:** Defendants deny the allegations in Paragraph 104.

105.    *First*, there was no business purpose for the transfer of assets to Unrestricted Subsidiary, Sonic, and to Holdings other than to remove the assets from Plaintiffs' Collateral and avoid having to prepay the Term Loan.

**Answer:** Defendants deny the allegations in Paragraph 105.

106.    *Second*, the Borrower was insolvent at the time of the Insider Transfers or became insolvent shortly after the Insider Transfers as a result thereof.  Blend and Ursini knew this.  They knew that (i) System1's financial performance was deteriorating, (ii) trading levels of the Term Loans were well below par, which indicated that the Borrower was insolvent and in financial distress, and (iii) they conceded that the Borrower would not be able to meet its obligations under the Term Loan in January 2024 with the free cash flow generated by the business.

**Answer:** Defendants assert that the January 2024 presentation  referenced in subsection (iii) of  Paragraph 106 speaks for itself, and respectfully refer the Court to the presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 106.

107.    *Third*, the Insider Transfers included multiple transfers to insiders through payment of the Insider Debts, plus "closing fees."

**Answer:** Defendants deny the allegations in Paragraph 107.

108.    *Fourth*, based on their substantial equity holdings and their Insider Debts, Blend and Ursini had clear motives to transfer assets to entities outside the Lenders' Collateral where they would benefit to the detriment of the Lenders.

**Answer:** Defendants deny the allegations in Paragraph 108.

109.    *Fifth*, the Borrower did not receive reasonably equivalent value when it repaid the Insider Debts at par, plus fees.

**Answer:** Defendants deny the allegations in Paragraph 109.

110.    Lone Star and CEE, who were controlled by Blend, Ursini and their respective affiliates, did not receive the Insider Transfers in good faith for reasonably equivalent value.

**Answer:** Defendants deny the allegations in Paragraph 110.

111.    The Insider Transfers were made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs.  The Insider Transfers are therefore in violation of, and voidable under, Cal. Civ. Code § 3439.04(a)(1).

**Answer:** Defendants deny the allegations in Paragraph 111.

### FIFTH CAUSE OF ACTION
**Constructive Fraudulent Transfer**
**(Against Openmail2, LLC, Stanley Blend in his capacity as Trustee of the Lone Star Friends Trust, and Jackson Hole Trust Company as Trustee of the CEE Holdings Trust)**

112.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

113.    Prior to, at the time of, and following the November 2023 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

**Answer:** The allegations contained in Paragraph 113 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 113.

114.    The November 2023 Transaction included multiple transfers of property, in the form of the Insider Transfers.

**Answer:** Defendants admit that the November 2023 transaction included multiple steps to effectuate transfers of property. Defendants otherwise deny the allegations in Paragraph 114.

115.    The Insider Transfers made by Borrower were made by an insolvent entity without receiving reasonably equivalent value.  The Borrower's transfer of assets to an Unrestricted Subsidiary enabled that entity to pay the worthless, unsecured Insider Debts at par, plus additional transaction fees.

**Answer:** Defendants deny the allegations in Paragraph 115.

116.    The Borrower was insolvent on the date of the Insider Transfers; was left with unreasonably small capital on the date of the Insider Transfers or as a result of the Insider Transfers; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.  Defendants knew this.  They knew that (i) the Borrower's financial performance was deteriorating, (ii) trading levels of the Term Loans were well below par, which indicated that the Borrower was in distress, and (iii) they conceded that the Borrower would not be able to meet its obligations under the Term Loan in January 2024 with the free cash flow generated by the business.

**Answer:** Defendants assert that the January 2024 presentation  referenced in subsection (iii) of  Paragraph 116 speaks for itself, and respectfully refer the Court to the presentation for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 116.

117.    Lone Star and CEE, who were controlled by Blend, Ursini and their respective affiliates, did not receive the Insider Transfers in good faith for reasonably equivalent value.

**Answer:** Defendants deny the allegations in Paragraph 117.

118.    By virtue of the foregoing, the Insider Transfers were constructive fraudulent transfers in violation of and voidable under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

**Answer:** Defendants deny the allegations in Paragraph 118.

119.    Accordingly, the Insider Transfers and any proceeds or products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, 3439.07, and 3439.08.

**Answer:** Defendants deny the allegations in Paragraph 119.

## SIXTH CAUSE OF ACTION
### Intentional Fraudulent Transfer
### (Against Orchid Merger Sub II, LLC and S1 Media, LLC)

120.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

121.    Prior to, at the time of, and following the August 2024 Transaction, Plaintiffs were creditors of the Borrower virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

**Answer:** The allegations contained in Paragraph 121 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 121.

122.    The August 2024 Transaction included multiple transfers of property, in the form of (i) Privacy, NextGen, MQH, and MQSH's transfers of the Products Business down to their

newly created subsidiaries, New Privacy, New NextGen, New MQH, and New MQSH; (ii) New Privacy, New NextGen, New MQH, and New MQSH's transfers of the Products Business up to the Borrower through OpCo and System1 S1, Inc.; (iii) the distribution of the Products Business up the corporate chain from the Borrower through Holdings and New Holdco to S1 Media; and (iv) all related transfers that facilitated the foregoing (such transfers, the "S1 Media Transfers").

**Answer:** Defendants admit that the August 2024 transaction included multiple transfers of property, including those described in subsections (i) and (iii). Defendants otherwise deny the allegations in Paragraph 122.

123.    The S1 Media Transfers transferred property with the actual intent to hinder, delay, or defraud the Borrower's creditors, including Plaintiffs.  Such intent is evident from the presence of multiple badges of fraud.

**Answer:** Defendants deny the allegations in Paragraph 123.

124.    *First*, System1 utilized the S1 Media Transfers to remove assets from the Borrower and place them outside of the Collateral securing the Term Loan under the Credit Agreement. Before the August 2024 Transaction, the Products Business was pledged to secure the Term Loan. In connection with the August 2024 Transaction, the Borrower removed these assets previously available to Plaintiffs and transferred them exclusively to S1 Media for the purpose of putting them beyond the reach of Plaintiffs and the other lenders under the Credit Agreement.

**Answer:** Defendants admit that System1 transferred assets, and the assets were moved outside of Plaintiff's Collateral. Defendants otherwise deny the allegations in Paragraph 124.

125.    *Second*, the Borrower received little, if any consideration in exchange for the S1 Media Transfers.  The S1 Media Transfers were effectively dividends to parent companies.

**Answer:** Defendants deny the allegations in Paragraph 125.

126.    *Third*, there was no business purpose for the S1 Media Transfers, and System1 has never articulated one.  The only purpose of the S1 Media Transfers was to strip assets from the Borrower, so that System1 shareholders could benefit from the S1 Media Transfers at the expense of Plaintiffs.

**Answer:** Defendants deny the allegations in Paragraph 126.

127.    *Fourth*, the Borrower was insolvent at the time of the S1 Media Transfers or became insolvent shortly after the S1 Media Transfers as a result thereof.

**Answer:** Defendants deny the allegations in Paragraph 127.

128.    *Fifth*, the S1 Media Transfers included transfers made to insiders, including Holdings and New Holdco.  New Holdco's insider status is evidenced by, among other things, its 100% ownership of Holdings.

**Answer:** Defendants deny the allegations in Paragraph 128.

129.    As shown through multiple badges of fraud, the S1 Media Transfers were made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs.  The S1 Media Transfers are therefore in violation of and voidable under Cal. Civ. Code § 3439.04(a)(1).

**Answer:** Defendants deny the allegations in Paragraph 129.

130.    Accordingly, the S1 Media Transfers and all proceeds and products thereof should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(1), 3439.07, and 3439.08(b).

**Answer:** Defendants deny the allegations in Paragraph 130.

### SEVENTH CAUSE OF ACTION
**Constructive Fraudulent Transfer**
**(Against Orchid Merger Sub II, LLC and S1 Media, LLC)**

131.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**Answer:** Defendants repeat, reallege, and incorporate by reference each and every response set forth above as if fully set forth herein.

132.    Prior to, at the time of, and following the August 2024 Transaction, Plaintiffs were creditors of the Borrower by virtue of their claims against the Borrower arising under, and in connection with, the Credit Agreement.

**Answer:** The allegations contained in Paragraph 132 constitute legal contentions and/or conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 132.

133.    The August 2024 Transaction included multiple transfers of property, in the form of the S1 Media Transfers.

**Answer:** Defendants admit that the August 2024 transaction included multiple steps to effectuate transfers of property. Defendants otherwise deny the allegations in Paragraph 133.

134.    The S1 Media Transfers were made by an insolvent entity without receiving reasonably equivalent value because the only purpose of the S1 Media Transfers was to strip assets from the Borrower and distribute those assets up the corporate chain to S1 Media, a newly created entity that was not a Loan Party under the Credit Agreement, thereby removing these assets from the Collateral securing the Term Loan.

**Answer:** Defendants deny the allegations in Paragraph 134.

135.    The Borrower was insolvent on the date of the S1 Media Transfers; was left with unreasonably small capital on the date of the S1 Media Transfers or as a result of the S1 Media Transfers; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

**Answer:** Defendants deny the allegations in Paragraph 135.

136.    By virtue of the foregoing, the S1 Media Transfers were constructive fraudulent transfers in violation of and voidable under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

**Answer:** Defendants deny the allegations in Paragraph 136.

137.    Accordingly, the S1 Media Transfers should be set aside, avoided and recovered to the extent necessary to satisfy Plaintiffs' claims pursuant to Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, 3439.07, and 3439.08(b).

**Answer:** Defendants deny the allegations in Paragraph 137.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court order:

1)    The avoidance and recovery of all transfers (and all proceeds and products thereof) made by the Borrower for the benefit of Holdings and Sonic in connection with the November 2023 Transaction;

2)    the avoidance and recovery of all Insider Transfers made by the Borrower to Defendants in connection with the November 2023 Transaction;

3)    the avoidance and recovery of all transfers (and all proceeds and products thereof) made by the Borrower for the benefit of S1 Media in connection with the August 2024 Transaction;

4)    money damages in an amount to be determined at trial, including compensatory damages for the Borrower and Holdings' breaches of the Credit Agreement;

5)    payment by Defendants of the costs and disbursements of this action, together with attorneys' fees incurred by Plaintiffs in connection with this action; and

6)    such other and further relief as this Court may deem just and proper.

**Answer:** Defendants deny that Plaintiffs are entitled to any of the relief sought.

## GENERAL DENIAL

Unless specifically admitted above, Defendants deny each and every allegation in the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Without waiving and hereby expressly reserving the right to assert any and all defenses based on, *inter alia*, discovery and factual developments, Defendants aver the following affirmative defenses to the claims asserted in the Complaint. In asserting these defenses, Defendants do not assume the burden with respect to any issue as to which applicable law places the burden on Plaintiffs.

### FIRST AFFIRMATIVE DEFENSE
*(Failure to State a Claim)*

Plaintiffs fail to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
*(No Damages)*

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs suffered no damages for the conduct alleged in the Complaint.

### THIRD AFFIRMATIVE DEFENSE
*(Damages are Speculative)*

Plaintiffs' damages, if any, are speculative and uncertain, and are impossible to ascertain.

### FOURTH AFFIRMATIVE DEFENSE
*(Failure to Mitigate)*

Plaintiffs' claims are barred, in whole or in part, on the ground that Plaintiffs' failed to mitigate any damages they may have suffered.

### FIFTH AFFIRMATIVE DEFENSE
*(Compliance with Contract)*

Plaintiffs' claims are barred, in whole or in part, because Defendants discharged their duties, if any, with respect to and in accordance with the terms of the parties' agreement.

### SIXTH AFFIRMATIVE DEFENSE
(*No Authority to Sue*)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack authority to sue under the terms of the Credit Agreement.

### SEVENTH AFFIRMATIVE DEFENSE
(*Waiver, Estoppel, Laches or Unclean Hands*)

Plaintiffs' claims are barred, in whole or in part, under the doctrines of waiver, estoppel, laches, or unclean hands.

### EIGHTH AFFIRMATIVE DEFENSE
(*Good Faith*)

Plaintiffs' claims are barred, in whole or in part, because Defendants acted in good faith and without wrongful intent, malice or any other applicable degree of fault.

### NINTH AFFIRMATIVE DEFENSE
(*Legitimate Corporate Purposes*)

Plaintiffs' claims are barred, in whole or in part, because the challenged transactions occurred for legitimate corporate purposes.

### TENTH AFFIRMATIVE DEFENSE
(*Solvency*)

Plaintiffs' claims are barred, in whole or in part, because at the time of the challenged transfers, Defendants were solvent, adequately capitalized, and did not intend to incur debts beyond their ability to pay.

### ELEVENTH AFFIRMATIVE DEFENSE
(*Intent*)

Plaintiffs' claims are barred, in whole or in part, because, at all relevant times, Defendants did not act with actual intent to hinder, delay, or defraud any present or future creditors.

## TWELFTH AFFIRMATIVE DEFENSE
### (*Particularity*)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to allege fraudulent conduct or intent with the requisite particularity.

## RESERVATION OF RIGHTS

Defendants hereby give notice that they intend to rely upon such other and further defenses as may be or become available or apparent during pretrial proceedings in this action, and Defendants expressly reserve the right to amend this Answer and assert all such defenses.

Dated: New York, New York
        December 19, 2025

Respectfully submitted,

 */s/ Gregory Silbert*
Gregory Silbert
Jennifer Brooks Crozier
Joseph R. Rausch
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
greg.silbert@weil.com
jennifer.crozier@weil.com
joseph.rausch@weil.com

*Attorneys for Defendants*